**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE JPMORGAN CHASE & CO.** | ) | |
| **SECURITIES LITIGATION,** | ) | |
| | ) | |
| | ) | **MDL No. 1783 - C.A. No. 06 C 4674** |
| **This document relates to** | ) | |
| | ) | |
| **Hyland v. Harrison,** | ) | **HONORABLE DAVID H. COAR** |
| **C.A. No. 06 C 4675** | ) | |
| | ) | |
| **Hyland v. J.P. Morgan Securities, Inc.** | ) | |
| **C.A. No. 06 C 4676** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This is a Multi-District Litigation, under Master Docket No. 06 C 4674, consisting of three separate cases: *Blau, et al. v. Harrison*, *et al.*, No. 04 C 6592 (or "Blau"); *Hyland v. Harrison et al.*, No. 06 C 4675 (or "Hyland I"); and *Hyland v. J.P. Morgan Securities Inc.*, No. 06 C 4674 (or "Hyland II"). To date, these three cases have been consolidated for discovery purposes only. On April 4, 2006, Blau filed the Second Amended Class Action Complaint For Violations of Federal Securities Laws, alleging two claims: (I) Violations of Section 14(a) of the Exchange Act and Rule 14a-9 of the SEC (Against All Defendants) and (II) Violation of Section 20(a) of the Exchange Act (Against the Individual Defendants). Hyland I and Hyland II consolidated their cases, and on September 25, 2006, they filed their Consolidated Amended Class Action Complaint, alleging six counts: (I) Against JPMC and the Individual Defendants

for Violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 Thereunder; (II) Against Harrison, JPMC, JPMSI and Dimon for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder; (III) Against Individual Defendants for Liability Under Section 20(a) of the Exchange Act; (IV) Against the Director Defendants for Breach of Fiduciary Duty; (V) Against JPMSI For Aiding and Abetting Breach of Fiduciary Duty; and (VI) Against JPMSI For Civil Conspiracy.

On October 23, 2006, Defendants filed a Motion to Dismiss Hyland Plaintiffs' Consolidated Amended Complaint. This action is against the Hyland Plaintiffs only, and does not affect the Blau case. This opinion addresses solely Defendants' Motion to Dismiss Hyland Plaintiffs' Consolidated Amended Complaint. For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part.


## I.      FACTS

**The Parties**

Hyland Plaintiffs claim in this case that there was a deceptive scheme executed by the Chief Executive Officers of J.P. Morgan Chase & Co. ("JPMC") and Bank One Corporation ("Bank One") in connection with the 2004 merger of those two companies. This court takes as true the following facts asserted by the Plaintiffs. This case pertains to the merger between JPMC and Bank One in 2004.

The Hyland Plaintiffs owned JPMC common stock at all relevant times, including on April 2, 2004. Plaintiff Samuel I. Hyland sold his JPMC shares on August 13, 2004.

JPMC, a financial holding company incorporated under Delaware law in 1968 with its principal executive offices in New York, is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity. As of April 30, 2004, prior to the consummation of the Merger, there were 2.08 billion shares of the Company's common stock outstanding. JPMC common stock is listed and traded on the New York Stock Exchange.

Defendant J.P. Morgan Securities, Inc. ("JPMSI"), a Delaware corporation, is a wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC, which, in turn, is a wholly-owned subsidiary of JPMC. JPMSI is a broker-dealer registered with the Securities and Exchange Commission and is a member of the National Association of Securities Dealers, Inc., the New York Stock Exchange and other exchanges. JPMSI acts as a primary dealer in U.S. government securities; advises on business strategies; makes markets in money market instruments and U.S. government agency securities; underwrites and trades corporate debt- and asset-backed securities, municipal bonds and notes, common and preferred stock, and convertible bonds offerings; and structures derivative transactions.

Defendant Harrison served as CEO and Chairman of the Board of Directors of JPMC since 1999, and was instrumental in negotiating the 2004 merger ("Merger") and signed the Proxy Statement issued in connection therewith. Harrison relinquished the CEO title at the end of 2005.

Defendant Dimon was Chairman and CEO of Bank One prior to the Merger and currently serves as the CEO of JPMC. Other named Defendants were, during the relevant time, directors

of JPMC ("Director Defendants") and signed the Proxy Statement issued in connection with the Merger. Defendant Dimon and the Director Defendants are collectively referred to as "Individual Defendants."

**The Negotiations**

In November 2003, Harrison and Dimon commenced negotiations concerning the possibility of a merger between JPMC and Bank One. The negotiations took place at an apartment in the Waldorf Towers, a few blocks from JPMC's midtown headquarters. The meetings were conducted in "secret." According to the Proxy Statement, Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations. Plaintiffs assert that the Director Defendants either were fully aware of the details of the negotiations between Harrison and Dimon or, as directors, had the opportunity and obligation to monitor and inquire into the details of such negotiations.

On November 18, 2003, Harrison briefed the full Board on his discussions with Dimon, and the Board, consisting of Director Defendants, authorized Harrison to continue discussions regarding a possible business combination with Bank One. At some point in November 2003, each party retained legal and financial advisors in connection with the merger discussions. JPMC retained JPMSI as its financial advisor for a $40 million fee.

During December 2003, Dimon and Harrison continued their negotiations on the key terms of the financial transaction, and periodically updated their respective boards on these communications. During the course of these discussions, Bank One CEO James Dimon offered to do the deal with no premium (the additional price paid above the value of the stock) if he

could become the chief executive officer immediately. However, Harrison wanted to keep his CEO title for two more years, and agreed to a deal with a 14 percent (approximately $7 billion) premium in exchange for retaining his CEO position for another two years. Hyland Plaintiffs allege this to be an unfair exchange ratio.

**Shareholder Approval**

Shareholder approval was necessary to complete the Merger. Despite the alleged rejection of the zero premium opportunity, JPMSI recommended the merger to the shareholders as economically fair. The Director Defendants also approved the Merger. After the close of trading on January 14, 2004, JPMC and Bank One issued a joint press release ("Press Release"). The press release reported the details of the deal, including the 14 percent premium, but omitted the no-premium offer. On April 21, 2004, the JPMC Board of Directors disseminated the Proxy Statement to the shareholders. The Proxy Statement listed the factors that the board considered in approving the merger, but did not disclose Dimon's offer to transact the merger without a premium if Dimon were appointed CEO of the merged company immediately. The shareholders voted on the Merger without knowledge of the no-premium offer. On May 25, 2004, JPMC released the results that shareholders approved the merger with 68 percent of the votes outstanding. On July 1, 2004, the merger was completed, including a premium of approximately 14 percent for Bank One shares. The merger agreement included a provision that Harrison would remain CEO of JPMC for two years after completion of the merger, and Dimon would serve as President and Chief Operating Officer until Harrison's CEO tenure was up, at which point Dimon would become CEO of the merged company.

**Newspaper Articles**

On June 27, 2004, a New York Times article by journalist Landon Thomas, Jr. reported that:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to give himself the two extra years, to secure a smooth transition, although he may have cost J.P. Morgan shareholders extra money in doing so. Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal. When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations.

Hyland Plaintiffs allege that this was the first opportunity for JPMC stockholders to discover that Harrison had turned down a no-premium opportunity and engaged in a deceptive entrenchment scheme. Landon Thomas, Jr. conducted an independent investigation by interviewing individuals with personal knowledge of the Merger negotiations. Hyland Plaintiffs assert that this account of the "no premium deal" and the "two-year compromise" were corroborated by other articles, including, *inter alia*, a January 15, 2004 CBS Marketwatch.com article, a January 26, 2004 FORTUNE article, a July 3, 2004 The Financial Times (London) article, and a December 29, 2004 Wall Street Journal article.

**Damages**

Plaintiffs assert that the omission of the no-premium offer harmed JPMC share holders who were duped into funding a Merger exchange ratio that heavily favored Bank One's shareholders. Instead of owning 61 percent of the combined company, they ended up with 58 percent. Plaintiffs assert that omission of negotiations and the rejected nil-premium opportunity

throughout the solicitation of votes violated the JPMC directors' fiduciary duty to disclose all material facts about the Merger to allow shareholders to vote for or against it with full knowledge of relevant information. As outlined above, Plaintiffs also seek relief in connection with Defendants' violations of federal securities laws.

## II. LEGAL STANDARD

In deciding a motion under 12(b)(6), the court considers the allegations in the complaint to be true and views all well-pleaded facts and any reasonable inferences drawn from the facts in the light most favorable to the plaintiff. *See Maple Lanes, Inc. v. Messer*, 186 F.3d 823, 824-5 (7th Cir. 1999). The court should grant a motion to dismiss for failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See id.* at 825 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-6, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)). Nevertheless, in deciding upon a motion to dismiss for failure to state a claim, the court need not ignore allegations that undermine the plaintiff's complaint, or assign any weight to unsupported conclusions of law. *See Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998).

## III. ANALYSIS

### A. Newspaper sources under PSLRA

Defendant moves to dismiss the Consolidated Amended Class Action Complaint on the ground that the Plaintiffs did not plead with sufficient particularity so as to satisfy the heightened pleading requirements under the Private Securities Litigation Reform Act of 1995 ("PSLRA" or "the Reform Act"). The PSLRA requires that "in any private action arising under [the Exchange Act] in which the plaintiff alleges that the defendant made an untrue statement of a material fact...the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 USCS § 78u-4(b)(1). Further, the Reform Act requires particularized pleading of scienter: "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(a)(2).

Defendants claim that the New York Times article reporting the alleged omission does not satisfy the pleading requirements under the PSLRA. The Seventh Circuit has not specifically addressed whether media and newspaper reports satisfy the heightened PSLRA pleading requirements of "particularity." However, other district courts have considered this issue. In particular, Third Circuit district courts have treated this issue at length. In *Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.*), a Delaware district court found that "Class Plaintiffs' allegations, to the extent that they clearly identify the media sources upon which they rely, are sufficient...to satisfy the heightened pleading standard under the securities

laws." 197 F. Supp. 2d 42, 79 (D. Del. 2002). The court in *Tracinda Corp*. relies on Third

Circuit precedent, which reasoned that "reliance on an article in The Wall Street Journal is not

reliance on an insubstantial or meaningless investigation. Plaintiffs and their attorneys need not

make further expenditures to prove independently that which may be read with some confidence

of truthfulness and accuracy in a respected financial journal." *Lewis v. Curtis*, 671 F.2d 779, 788

(3d Cir. 1982). The *Lewis* decision addressed pleading verification under Rule 23.1. Its rationale

was applied to the heightened pleading requirement under the PSLRA in *Tracinda Corp.*

*Tracinda,* to the effect that a reputable newspaper article by itself may be sufficient to satisfy the

PSLRA requirement. Even if it does not go so far, *Tracinda Corp. Tracinda* concluded that when

class plaintiffs do not solely rely on newspaper articles, but conduct an independent investigation

which corroborated the articles, the complaint allegations derived from reputable media sources

were sufficient to meet the requirement of the PSLRA. 197 F. Supp. 2d 42, 81 (D. Del. 2002).

A Northern California district court has also opined that newspaper articles that

"corroborate plaintiff's own investigation and provides detailed factual allegations" may be used

as a basis for an inference of scienter. *In re McKesson Hboc Secs. Litig*., 126 F. Supp. 2d 1248,

1271 (D. Cal. 2000). *In re McKesson Hboc* cautions, however, that "newspaper articles should

be credited only to the extent that other factual allegations would be–if they are sufficiently

particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no

more sufficient if they come from a newspaper article than from plaintiff's counsel." *Id*.

Nonetheless, "if the newspaper article includes numerous factual particulars and is based on an

independent investigative effort, it is a source that may be credited in determining whether

plaintiffs have alleged facts sufficient to raise a strong inference of scienter."

Taking these rationales into account, at a minimum, newspaper articles satisfy the heightened PSLRA pleading requirements if (1) they are based on an independent investigative effort, (2) they are sufficiently particular and detailed to indicate their reliability, and (3) Plaintiffs' counsel conducted its own independent investigation which corroborates the information in the article.

In the present case, the Plaintiffs have asserted, which this court must accept as true, that an independent investigation was conducted by journalist Landon Thomas, Jr., who interviewed several individuals with personal knowledge of the merger. The article provided detail about the people involved (Mr. Dimon and Mr. Harrison) and the details of the negotiations, including where and when the negotiations took place, the existence of the no-premium offer, and terms of the final deal: Mr. Harrison would remain CEO for two years in exchange for a 14 percent premium. The article did not simply state that securities fraud or a misstatement was committed, but gave the details of the deal, indicating reliability. Further, the New York Times is a well-known and reputable paper, read nationally and internationally. The newspaper article is both independent and reliable. Finally, Hyland Plaintiffs' counsel has alleged that they conducted a thorough investigation of all reasonably available sources of information, including: public filings of JPMC, JPMSI and Bank One, securities analysts' reports and investor advisory services concerning JPMC and Bank One, pleadings in other related cases, JPMC and Bank One press releases and other publically disseminated statements, reports concerning JPMC, JPMSI and Bank One in print and electronic media, and interviews of relevant witnesses. Plaintiffs present evidence of email correspondences, other articles and related documents that corroborate

the article's allegations. Accordingly, Plaintiffs allegations satisfy the heightened pleading requirements under the PSLRA.

Defendants rely on *Makor Issues & Rights, Ltd. v. Tellabs, Inc*., 437 F.3d 588 (7th Cir. 2006), in arguing that Plaintiffs must describe confidential sources with "sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged.'" Defendants argue that because the sources of the New York Times are confidential, they do not meet this requirement. *Makor,* however, is not directly applicable to the present case. In *Makor*, the standard is applied to plaintiffs counsels' confidential sources, not the confidential sources of a reliable and independent newspaper. A reputable newspaper, where an independent investigation was conducted, provides an additional layer of reliability in reporting. Further, the confidential nature of a journalist's source is used to encourage reporting and accuracy. In the present case, the confidential source is the informant to a newspaper, not to the Plaintiffs' counsel directly. In such a case, *Makor* is inapposite, and the Third Circuit cases are more appropriately applied.

## B. Rule 9(b) Pleading Requirements

Defendants move to dismiss on the ground that Plaintiffs' claims sounding in fraud lack the particularity required by Rule 9(b). Rule 9(b) applies to "all averments of fraud or mistake." In such cases, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). With respect to securities fraud cases, Rule 9(b) requires that the essential element of scienter be pled with a sufficient level of factual support: "the complaint . . . must afford a basis for believing that plaintiffs could prove scienter." *DiLeo v. Ernst & Young*, 901

F.2d 624, 629 (7th Cir. 1990), *Moss v. HealthCare Compare Corp. (In re HealthCare Compare Corp. Sec. Litig.)*, 75 F.3d 276, 281 (7th Cir. 1996). The Seventh Circuit states, "We have said that a sufficient level of factual support may be found where the circumstances are pled "in detail." This means the who, what, when, where, and how: the first paragraph of any newspaper story." *Id*.

As an initial matter, Hyland Plaintiffs suggest that Defendants ask this court to apply Rule 9(b) indiscriminately to all claims. This is incorrect. Defendants have asked to apply Rule 9(b) to claims sounding in fraud only. Further, according to this court's reading to the Consolidated Amended Complaint, Hyland Plaintiffs have specifically segregated the negligence claims (Count I, alleging violations of §14(a), "not sounding in fraud") from fraud claims (Count II, alleging violations of §10(b) against Harrison, Dimon, JPMC and JPMSI).

The Defendants contend that every claim that sounds in fraud is subject to the heightened pleading requirement of Rule 9(b) and must be stated with particularity. In the Seventh Circuit, this means that the complaint must include the "who, what when, where and how" of the alleged fraud in order to give sufficient factual support for the scienter. The Consolidated Amended Class Action Complaint fulfills this requirement. The "who" are Harrison, Dimon, JPMSI and JPMC. The "what" and "when" surrounds the negotiations between Harrison and Dimon in December of 2003, and the non-disclosure of the alleged no-premium offer to the shareholders. The merger deal that was presented for shareholder approval included a 14 percent premium in exchange for Harrison remaining as CEO for two additional years. The "where" includes the Waldorf Tower apartments and the conference room of Bank One's M&A law firm, Wachtell Lipton Rosen & Katz. The "how" involved the negotiations, the communication with the

Directors, the Proxy Statement and Press release, and the non-disclosure of the alleged no-premium deal to the shareholders. The complaint includes sufficient detail and factual support to satisfy Rule 9(b) pleading requirements for claims of fraud or mistake.

## C. Mental States of Negligence

Defendants move to dismiss the Director Defendants from charges under Count I of the Consolidated Amended Complaint ("CAC") on the ground that Plaintiffs failed to allege with particularity of fact to give rise to a strong inference that the Director Defendants acted with the required state of mind, specifically, negligence. Count I of the CAC alleges that JPMC and the Individual Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, when they negligently omitted to state material facts necessary (namely, the no-premium offer) in the Proxy Statement. Under the PSLRA, any action brought under the Exchange Act, "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate the [Act], state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). Defendants claim that Plaintiffs did not allege with particularity to give a strong inference of negligence.

Plaintiffs argue that (1) negligence is not a state of mind, and therefore does not require a pleading of particular facts to give strong inference, and (2) even if it were, the pleadings are sufficient. There seems to be some discrepancy on how a 14(a) negligence allegation should be treated under 15 U.S.C. §78u-4(b)(2). The Seventh Circuit has not ruled on whether the PSLRA applies to Section 14(a) cases. The district courts in this circuit have been split on the issue. In

*Blau v. Harrison*, Judge Hibbler stated that "Plaintiffs' Section 14(a) allegations are not required to meet the PSLRA particularity requirement because these claims are based on averments of negligence." 2006 U.S. Dist. LEXIS 18785 (N.D.Ill., 2006). Judge Hibbler reasoned that because the Seventh Circuit ruled that Rule 9(b) pleading requirements were not applicable to negligence claims, the PSLRA heightened requirements would not be applicable either. *Id.; Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003). Judge Leinenweber disagreed with the ruling in *Blau*, concluding that "the Seventh Circuit's opinion in [*Kennedy*]…never addressed the PSLRA at all," but only stated that Rule 9(b)'s heightened pleading standards did not apply to Section 14(a) claims unless those claims charged fraud, as opposed to negligence. *Beck v. Dobrowski, et al.*, 2007 U.S. Dist. LEXIS 84093 (N.D.Ill. 2007). Judge Leinenweber found that this analysis was inapplicable to the PSLRA, because Rule 9(b) was "expressly limited to claims of fraud or mistake," whereas the PSLRA encompasses negligence claims as well. *Id*. Judge Leinenweber states the following, specifically finding that negligence constitutes a "state of mind":

> The Court concludes that the PSLRA governs Plaintiff's claim. Although the Seventh Circuit has not decided whether the PSLRA applies to Section 14(a) cases, the statutory language is unambiguous. All relevant sections of the Act commence with the phrase, "*in any private action arising under this chapter*," 15 U.S.C. §78u-4(b)(1),(2).& (4) (emphasis added). The Act contains no exceptions based on considerations of scienter or previous common law causation rules. Indeed, the Act's pleading standard provisions are to the contrary. Section(b)(2) applies to actions for money damages requiring proof of only "a particular state of mind." Since negligence is a state of mind, the language of Section (b)(2) by its terms encompasses negligence-based securities actions.

*Id*. The circuit courts have not definitively addressed the issue of whether negligence constitutes a "state of mind" under the PSLRA, but the majority have applied 15 U.S.C. §78u-4(b)(2) to Rule 14(a) claims of negligence.  See, e.g., *Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674,

682 (9th Cir. 2005); *Hayes v. Crown Cent. Petroleum Corp.*, No. 02-2190, 78 Fed. Appx. 857, 861 (4th Cir. 2003); *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004). This court agrees with the reasoning and conclusion of *Beck v. Dobrowski, et al.*, and joins the majority of courts in finding that the PSLRA standards apply to all claims under the Exchange Act, including Section 14(a) claims of negligence.

The question then becomes whether Plaintiffs' pleadings are sufficient to give rise to a strong inference of negligence on the part of the Director Defendants. Paragraph 78 of the CAC allege that "Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations," and that the Director Defendants were "either fully aware of the details of the negotiations between Harrison and Dimon or, as directors, had the opportunity and obligation to monitor and inquire into the details of such negotiations." That is, Plaintiffs have alleged that Director Defendants were in regular contact with Harrison and Dimon, and had opportunity to monitor and inquire. Whether or not they actually inquired, or acted reasonably in their roles as Director, are questions on the merits. The pleadings allege sufficient facts regarding the interaction between the Directors and Harrison and Dimon to support an inference that the Director Defendants "knew or should have known" about the no-premium offer. The Plaintiffs' CAC sufficiently pled violations of Section 14(a).

**D. Mental States of Scienter**

As to Count II claims of fraud or deceit against Harrison, Dimon, JPMC and JPMSI, Plaintiffs are required to "state with particularity facts giving rise to a strong inference that the

defendants acted with [a fraudulent] state of mind." 15 U.S.C. §78u-4(b)(2). The Seventh Circuit

has concluded that "the best approach is for courts to examine all of the allegations in the

complaint and then to decide whether collectively they establish such an inference. *Makor Issues*

*& Rights, Ltd. v. Tellabs, Inc*., 437 F.3d 588, 601 (7th Cir. 2006). Motive and opportunity are

useful indicators of a fraudulent state of mind, though they may not be necessary or sufficient.

*Id*.

Defendants argue that the claims against Harrison and Dimon fail to adequately plead

scienter because they are based on no more than supposed motives to increase incentive

compensation and reputation/prestige. First, the Seventh Circuit has established motive as a

"useful indicator," and should not be taken lightly. In fact, the Second and Third Circuit found

that motive and opportunity alone are sufficient to satisfy 15 U.S.C. §78u-4(b)(2). Although the

Seventh Circuit does not take this position, it does acknowledge motive and opportunity to be

important factors. As such, the fact that the pleadings allege that Harrison was motived to

increase his incentive compensation and to guild his reputation are important considerations.

Further, Plaintiffs allege that Dimon wanted to "reclaim the mantle of Wall Street superstar," and

was motivated to increase his prestige and reputation. While these facts taken separately may not

be sufficient, they do go to show motive for engaging in the alleged fraud, and serve as "useful

indicators." In addition to motive, Plaintiffs have also alleged opportunity and acts of

concealment by Harrison and Dimon. As mentioned above in the Rule 9(b) discussion, Plaintiffs

have alleged the who, what, where, when and how of the no-premium offer and concealment,

and has shown that Harrison and Dimon had the opportunity to negotiate in secret. Further,

Plaintiffs include in their complaint specific incidents where Harrison and Dimon allegedly

evaded and failed to disclose the no-premium offer and the two-year compromise, even when asked directly about it. *See* CAC ¶¶134-141. Plaintiffs specifically claim that this shows "they were conscious of their wrongdoing, and, in particular, well aware of the need to conceal their [secret] deal." CAC ¶139. Taking Plaintiffs allegations as true, and viewing the allegations collectively–that Harrison and Dimon had motive and opportunity to deceive, and that they took steps towards concealing and deceiving to their own advantage-this court finds that the Hyland Plaintiffs have alleged with particularity facts giving rise to a strong inference that Harrison and Dimon acted with an intent to deceive, manipulate or defraud.

Defendants also argue that Plaintiffs failed to allege scienter for JPMC, because the scienter of Harrison cannot be imputed on JPMC. This issue was directly addressed in *In re Sourcecorp Sec. Litig.*, 2006 U.S. Dist. LEXIS 41381 (D. Tex. 2006). Although this court is not bound by the decision of other district courts, it will give due weight to their reasoning. In *In re Sourcecorp Sec. Litig.*, the court concluded, "In determining whether to impute an executive's scienter to the company, this Court looks to whether an executive's fraud operates to benefit the company or whether the fraud is committed against the company." *Id.*; *see also FDIC v. Shrader & York*, 991 F.2d 216, 224-25 (5th Cir. 1993); *In re Cendant Corp. Sec. Litigation*, 109 F. Supp. 2d 225, 233 (D.N.J. 2000) (fraud imputed when officer's conduct was "for the benefit of the corporation."); *In re Kidder Peabody Securities Litig.*, 10 F. Supp. 2d 398, 415-417 & n.17 (S.D.N.Y. 1998) (finding evidence to support a reasonable inference of corporation's scienter where a securities analyst had openly reported hundreds of millions of dollars in false profits, but not deciding imputation issue because of dispute as to whether trader was acting adversely to corporation's interests). This court finds this rational and analysis persuasive. In the present case,

Plaintiffs allegations that Harrison agreed to remain as CEO for two years in exchange for a 14 percent premium against JPMC in the merger clearly did not benefit the company. In fact, the allegations suggest that Harrison enriched himself at the expense of the corporate entity. Therefore, Count II is dismissed as to Defendant JPMC only.

Defendants further assert that Plaintiffs failed to allege scienter for JPMSI, because they only pleaded motive for compensation (a high fee) and reputation (to increase their ranking based on the dollar value of deals they participated in). See CAC ¶ 170-77. Pleading motive for compensation and reputation alone may not be sufficient to satisfy the PSLRA heightened pleading requirements on scienter. However, Defendants misstate Plaintiffs' claim: they also allege facts that suggest that the Merger exchange ratio exceeded a range of reasonableness under various objective metrics (see CAC ¶114-20), and yet was still approved by JPMSI. This allegation that JPMSI endorsed an "unfair" ratio, together with the allegations that give rise to motive, suggest a strong inference of a fraudulent state of mind, sufficient to satisfy the PSLRA pleading requirements under 15 U.S.C. §78u-4(b)(2).

**E. Losses, Loss Causation, or Reliance**

Defendants move to dismiss on the ground that Plaintiffs failed to allege any cognizable losses in their §10(b) claim. Defendants argue that federal securities laws only allow victims to recover actual damages, not merely stock prices that are not as high as they otherwise could be. Defendants cite to *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.* in arguing that damages cannot encompass potential "profit," but only "out of pocket" losses. 910 F.2d 1540, 1552 (7th Cir. 1990). In the present case, unlike *Astor Chauffeured Limousine Co.,* the damages alleged are not hypothetical investment profits, but rather are clear figures negotiated in

exchange for Harrison's two year CEO tenure. In other words, according to Plaintiffs'

allegations, in exchange for Harrison's two year CEO tenure, Plaintiffs had to pay "out-of-

pocket" a 14 percent premium. The Supreme Court has concluded that damages should be

measured by "the difference between the fair value of all...that the seller received and the fair

value of what he would have received had there been no fraudulent conduct." *Affiliated Ute*

*Citizens v. United States*, 406 U.S. 128, 154 (U.S. 1972). In the present case, the actual loss is

quantifiable and cognizable. Taking Plaintiffs' allegations as true, the shareholders received 58

percent of the combined company in the Merger with the alleged fraudulent omission, but they

would have received 61 percent if they had known about the no-premium offer and voted in

favor of the no-premium deal. Put another way, JPMC stock sellers would have received $7

billion more had there been no fraudulent conduct. This allegation constitutes a cognizable loss.

Defendants further claim that Plaintiffs did not show loss causation. Under the PSLRA, a

plaintiff must prove that the "omission of the defendant alleged to violate [the Exchange Act]

caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. §78u-4(b)(4).

Plaintiffs allege that the omission of the no-premium offer caused the shareholders to approve

the 14 percent premium deal instead of the no-premium deal. As a result of the omission, the

Plaintiffs received 58 percent of the combined company instead of 61 percent, an amount

approximately $7 billion in value. The CAC clearly alleges the causal connection between the

loss ($7 billion) and the fraudulent omission. Defendants cite to several cases that are fact-

specific, and not applicable to the present case.

Finally, Defendants argue that Plaintiffs must also plead reliance. Defendants cite to

*Dura Pharms., Inc. v. Broudo*, in arguing that Plaintiff must allege that they bought their shares

in reliance of the no-premium offer omission. 544 U.S. 336 (U.S. 2005). As an initial matter, the facts in *Dura Pharms., Inc.* differ from the present case. In *Dura Pharms., Inc.,* the plaintiffs bought stock after an alleged misrepresentation caused the stock prices to be artificially inflated. After they bought the stock in reliance of the misrepresentation, the stock prices fell. The loss suffered by the plaintiffs in *Dura Pharms., Inc* were due to the fact that they bought stock in reliance of the misrepresentation. The fact scenario is different in the present case, where Plaintiffs approved the terms of the merger in reliance of a misrepresentation (or omission). Under Plaintiffs' theory, the omission cost the shareholders collectively approximately $7 billion in stock value, because the Plaintiffs allege they would not have approved the merger had they known about the availability of the no-premium option. Reliance is satisfied in this case, because the loss was not from purchasing stock, but from the terms of the merger itself. Thus, the fact that plaintiffs purchased their stock prior to January 2004 is not relevant in this case. This court finds that Plaintiffs sufficiently pleaded reliance.

**F. Fairness Opinion by JPMSI**

Defendants claim that Plaintiffs failed to plead misstatement in its §10(b) claim against JPMSI on the fairness opinion prepared by JPMSI in the Proxy Statement. Statements of opinion or belief are actionable only if they are both objective and subjectively false. *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1095 (U.S. 1991). "To plead the falsity of a statement of opinion, a plaintiff must plead with particularity why the statement of opinion was objectively and subjectively false. A fairness opinion is objectively false if the subject matter of the opinion is not, in fact, fair, and is subjectively false if the speaker does not, in fact, believe the subject

matter of the opinion to be fair." *Shurkin v. Golden State Vintners, Inc*., 2005 U.S. Dist. LEXIS 39301 (D. Cal. 2005). In the present case, Plaintiffs have pled both. First, Plaintiffs have pled that the subject matter of JPMSI's fairness opinion is objectively false. Plaintiffs present figure charts that show JPMSI's analysis provided that the Merger exchange ratio exceeded the highest point in the range of reasonableness and/or fairness despite JPMSI's endorsement of the Merger. Second, Plaintiffs also pled subjective falsity, alleging that JPMSI knew of the unfair ratio but endorsed the merger in an effort to collect compensation and further its own ranking amongst its competitors. Whether these allegations are true, and to what extent the numbers are accurate, are questions on the merits. As to the pleading requirements at issue in a motion to dismiss, Plaintiffs have sufficiently pleaded misstatement by JPMSI for a §10(b) claim.


## G. Materiality

Defendants move to dismiss on the ground that the omission of the no-premium offer is not material. The Supreme Court teaches that

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills'* general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Tsc Indus. v. Northway*, 426 U.S. 438, 448 (U.S. 1976). Under this standard, an omission of an offer that would have resulted in a $7 billion difference in merger compensation would be considered important in deciding how to vote. Further, if, as Plaintiffs allege, Dimon offered to consummate the transaction for no premium and the only reason Harrison rejected the offer was to retain a position as CEO of the merged company, that may be a fact that has a "substantial likelihood" of changing a reasonable shareholder's vote. While not every detail of the negotiations is required to be disclosed, given the large dollar amount involved and the personal nature of the two-year compromise, there is a substantial likelihood that the omission of the no-premium offer in the Proxy Statement would have altered the mix of available information. The alleged omission is material.

## H. State Claims

Count IV of the CAC alleges breach of fiduciary duty against the Director Defendants. This claim is brought pursuant to Delaware common law. In Delaware state court, Plaintiffs brought a similar suit alleging breach of fiduciary duty by the Director Defendants. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 818 (Del. Ch. 2005). This claim was dismissed by the state court because Plaintiffs failed to first make a demand on the Board, as required by Delaware's Court of Chancery Rule 23.1. Under Rule 23.1, a plaintiff shareholder must make a demand upon the corporation's current board to pursue derivative claims owned by the corporation before a shareholder is permitted to pursue legal action on the corporation's behalf. The plaintiff may argue demand futility under the two-prong test of *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984). The first prong of the *Aronson* test is whether "a shareholder

[has pled] with particularity facts that establish that demand would be futile because the directors are not independent or disinterested." *Id*. The second prong of the test is whether "a reasonable doubt is created that … the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id*. The two prongs of the *Aronson* test are disjunctive, meaning that if either part is satisfied, demand is excused." *Id.*

The Delaware Court of Chancery determined that the suit was derivative, despite Plaintiffs attempt to frame it as a direct challenge. The alleged harm (loss of $7 billion worth of stock) was against JPMC, and any potential recovery of stock would be received by JPMC, not the shareholders directly. The Delaware Court of Chancery also determined that the Plaintiffs did not meet the demand futility requirements. Conducting a thorough analysis of the Director Defendants, the Delaware Court of Chancery determined that the majority of the board of JPMC were independent. Thus, Plaintiffs failed to satisfy the first prong of the *Aronson* test that shareholders must plead with particularity of facts establishing that demand would be futile because the directors were not independent or disinterested. The Delaware Court of Chancery also found that the Plaintiffs failed to call into question the Directors' good faith, honesty or lack of adequate information, and thus did not show why the board's decision is not protected by the business judgment rule. As such, Plaintiffs failed to satisfy prong two of ths *Aronson* test, and the demand was found not to be futile. Because the suit was derivative, and the demand was not futile, Plaintiffs were required to place a demand with the current board before bringing legal action. The Delaware Court of Chancery dismissed the breach of fiduciary claim, because Plaintiffs had not made such a demand. *In re J.P. Morgan Chase & Co. S'holder Litig*., 906 A.2d 808, 818 (Del. Ch. 2005).

This ruling is applicable to the present case. Plaintiffs make essentially the same breach of duty claim. The facts alleged on the individual Directors are essentially the same. While the federal complaint may include some more details, the pertinent facts are sufficiently similar that this court's analysis mirrors that of the state court. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 818 (Del. Ch. 2005). The differences between the federal complaint and the state complaint listed by Vice Chancellor Lamb do not change the analysis or conclusion of the Delaware Court of Chancery. Thus, Count IV of the complaint is dismissed, as legal action is not sanctioned before a demand is made on the current board.

Because Count IV is dismissed, Count V against JPMSI for aiding and abetting the breach of fiduciary duty and Count VI against JPMSI for civil conspiracy are similarly dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted in part and denied in part. Defendant's motion to dismiss is granted as to Count II against JPMC only. Defendant's motion to dismiss is also granted as to Count IV, V and VI. Defendant's motion to dismiss is denied as to all other claims.

**Enter:**

**/s/David H. Coar**

_____

David H. Coar

United States District Judge

Dated: December 18, 2007