IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

------------------------------ x
IN RE JPMORGAN CHASE & CO.  : MDL No. 1783
SECURITIES LITIGATION       :
------------------------------ x
This document relates to:   :

*Hyland v. Harrison et al.*,  : Master Docket No. 06-4674
    Civil Action No. 06-4675   : Hon. David H. Coar

*Hyland v. J.P. Morgan Securities Inc.*, :
    Civil Action No. 06-4676

------------------------------ x

## DEFENDANTS' MOTION FOR RECONSIDERATION

On December 18, 2007, this Court granted in part and denied in part defendants' motion to dismiss this action, allowing plaintiffs' claims under § 10(b) (except as to JPMorgan Chase ("JPMC") itself) and § 14(a) of the Securities Exchange Act of 1934 to proceed. Defendants respectfully submit that certain aspects of the Court's opinion merit reconsideration. First, the Court's decision to permit a claim to proceed under § 10(b) by plaintiffs who merely held stock, and were not buyers or sellers during the period of the alleged fraud, is contrary to well-established Seventh Circuit and U.S. Supreme Court precedent. Because plaintiffs did not purchase or sell stock during the relevant time period, they have no standing in this matter. Second, the Court relied on a standard for pleading state of mind that was reversed by the U.S. Supreme Court. *See Tellabs v. Makor Issues & Rights, Ltd.*, 168 L. Ed. 2d 179 (2007) (*reversing Makor Issues & Rights, Ltd. v. Tellabs*, 437 F.3d 588 (7th Cir. 2006)). Under the standard established by the Supreme Court, plaintiffs have not pleaded defendants' states of mind, and

their securities claims should be dismissed. Finally, the Court erred in finding that plaintiffs' inadequate scienter allegations were corroborated by other facts.

This Court has both inherent and common-law authority to reconsider its interlocutory orders "to correct manifest errors of law or fact." *Brewton* v. *City of Harvey*, 319 F. Supp. 2d 890, 891 (N.D. Ill. 2004); *see also Caisse Nationale de Credit Agricole* v. *CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996). Moreover, one of the bases for reconsideration is plaintiffs' lack of standing, which "may be raised at any time." *Bd. of Educ. of Thornton Twp. High Sch. Dist. 205* v. *Bd. of Educ. of Argo Cmty. High Sch. Dist. 217*, No. 06-2005, 2006 U.S. Dist. LEXIS 63169, *15 (N.D. Ill. Aug. 21, 2006) (*citing Jones* v. *City of Los Angeles*, 444 F.3d 1118, 1126 (9th Cir. 2006)).

## I. PLAINTIFFS HAVE NO STANDING TO ASSERT CLAIMS UNDER § 10(B).

To recover under § 10(b) and Rule 10b-5, six elements must be satisfied, including a misstatement or omission in "connection with the purchase or sale of a security." *Ray* v. *Citigroup Global Mkts.*, 482 F.3d 991, 994 (7th Cir. 2007). This is an essential element: "one asserting a claim for damages based on the violation of Rule 10b-5 *must* be either a purchaser or seller of securities." *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723, 751 (1975) (emphasis added). The rule of *Blue Chip Stamps* "holds that a plaintiff in a Rule 10b-5 case has standing to sue only if a fraudulent activity caused him to buy or to sell stock." *Marsh* v. *Armada Corp.*, 533 F.2d 978, 981 (6th Cir. 1976); *see also O'Brien* v. *Continental Illinois National Bank and Trust Co. of Chicago*, 593 F.2d 54, 60 (7th Cir. 1979) (noting that the "fundamental purpose" of Rule 10b-5 is to require disclosure of "information that would be useful to [investors] in deciding whether to *buy* or *sell* securities") (emphasis added). This element is often referred to as "transaction causation" and is distinct from the element of loss causation. *Retsky Family Ltd. Pshp.* v. *Price Waterhouse LLP*, No. 97-7694, 1998 U.S. Dist.

LEXIS 17459, *43 (N.D. Ill. Oct. 21, 1998). No transaction causation is present here. Neither plaintiff Stephanie Speakman nor plaintiff Samuel Hyland is a purchaser or seller of securities as contemplated by § 10(b), because none of their purchases or sales occurred at a time when they could conceivably have been "caused" by the alleged misstatements or omissions. (*See* Defs.' Mem. in Support of their Mot. to Dismiss at 8–9.)

Here, every alleged misstatement or omission was made between the January 2004 merger announcement and the issuance of the final April 2004 proxy statement. (*See, e.g.*, CAC ¶¶ 84–85, 95, 106, 135–138, 146–147, 150–152, 156, 159.) Both plaintiffs have certified that they acquired their stock in JPMC before the date on which the JPMC/Bank One merger was announced, and thus before any of the alleged misstatements occurred. In its December 18 Opinion ("Op."), this Court held that "the fact that plaintiffs purchased their stock prior to January 2004 is not relevant in this case." (Op. at 20.) But this fact is actually dispositive. "Statements made after named plaintiffs purchased their stock cannot form the basis for § 10(b) liability," *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 908 (N.D. Ill. 2001), because plaintiffs cannot have been induced to purchase stock by statements that have not yet been made.

The Court in its December 18 Opinion noted that plaintiffs' alleged "loss was not from purchasing stock, but from the terms of the merger itself." (Op. at 20.) This sort of "loss" is not actionable under § 10(b). The Seventh Circuit's holding in *Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531 (7th Cir. 1998), is dispositive, and establishes that losses attributed to "unsound or oppressive corporate reorganizations," rather than to a "drop in the value of [the corporation's] stock when the truth emerged," cannot give rise to a § 10(b) claim. *Id.* at 535, 536.

Analogously to this case, the *Isquith* plaintiff alleged fraud in connection with a corporate spinoff (as opposed to a merger) on the theory that if the corporation had disclosed its motivation for the transaction, shareholders would have blocked it. *Id.* at 532–33. The spinoff

3

resulted in shareholders of Baxter International owning shares of the newly created Caremark International in addition to their Baxter shares. The loss claimed by the *Isquith* plaintiff was not based on a decline in either Baxter's or Caremark's stock price; instead, the plaintiff claimed that if "the true purpose of the spinoff had been revealed," "Baxter would then have been kept intact" and "Baxter stock would . . . today be worth more than the current combined value of Baxter and Caremark stock." *Id.* at 533. This is precisely the same type of loss claimed by plaintiffs here. *Compare id. with* CAC ¶ 257 ("But for the entrenchment scheme, JPMorgan's stock price would have been higher.").

The District Court in *Isquith* dismissed the case on the ground "that there was no purchase or sale of securities" as required by § 10(b). 136 F.3d at 532. The Seventh Circuit affirmed, explaining:

> [T]he securities laws . . . create a remedy, so far as bears on this case, for someone who is induced by ("relied on," the courts usually say) a misrepresentation or a misleading omission to buy or sell a stock. This presupposes that the someone had a choice, a choice distorted by the fraud. The members of the class in this case had no choice. They made no investment decision. They therefore cannot have been induced by the alleged fraud to buy or sell any securities. . . . [T]here can be no suit under the securities laws by someone who has not made an investment decision, that is, who has not made a choice, a voluntary decision albeit one induced by the fraud, to buy or sell securities.

*Id.* at 534, 536; *see also In re Penn Central Sec. Litig.*, 367 F. Supp. 1158, 1173–74 (E.D. Pa. 1973) (holding that when plaintiffs "continued to hold stock in the same corporation, which had merely added the assets of another company to its own," allegations "that they have declined in value" did not give rise to a § 10(b) claim because "[t]he issuance of new shares . . . was strictly a matter of corporate management which, no matter how unwise it may have been and even if it 'diluted' plaintiffs' proportional investment in their corporation, brought about no change in that investment which could conceivably be viewed as a sale, forced or otherwise, of securities"); *Krieger v. Gast*, No. 98-3182, 1998 U.S. Dist. LEXIS 15422, *8 (N.D. Ill. Sept. 22, 1998) ("In

the absence of an investment decision, false statements may not be made in connection with a purchase or sale of securities.").

Pre-merger JPMC shareholders, including plaintiffs, did not come to own shares in the combined entity by making an "investment decision . . . to buy or sell," *id.*, but by holding on to the shares they already owned. Any loss under those circumstances is not cognizable under § 10(b). There is no such thing as a § 10(b) claim on behalf of holders such as plaintiffs here, *see Blue Chip Stamps*, 421 U.S. at 737–38, and any losses attributable to a shareholder vote— rather than to purchases and sales—must be remedied by § 14(a), not § 10(b).

If plaintiffs have no standing under § 10(b) by virtue of being purchasers or holders—and they do not—then they can have standing only if they allege they *sold* stock in reliance on the alleged misstatements. But plaintiff Stephanie Speakman never alleged that she sold her stock. And plaintiff Samuel Hyland sold his stock on August 13, 2004 (CAC ¶ 28)— well *after* the June 27, 2004 *New York Times* article that plaintiffs allege revealed the "truth" about defendants' alleged misstatements. In the same way that a purchase of securities before the alleged misstatements is irrelevant for § 10(b) purchases, a *sale* of securities *after* the truth about the alleged misstatements is revealed cannot be the basis for a § 10(b) "seller" claim.

"[S]tanding is not accorded to a plaintiff if his purchase or sale occurs before the alleged fraudulent conduct, *or after the alleged fraudulent conduct was exposed.*" *Marsh*, 533 F.2d at 982 n.3 (emphasis added); *see also Safecard Services, Inc. v. Dow Jones & Co.*, 537 F. Supp. 1137, 1142 (E.D. Va. 1982) (holding that, for purposes of transaction causation, "if the seller knows the statement to be false, he has not relied on its purported veracity, and the statement has not induced his sale"); *In re Penn Central Sec. Litig.*, 62 F.R.D. 181, 185, 187 (E.D. Pa. 1974) (dismissing plaintiffs' § 10(b) claim where sales were made after the fraud was disclosed because the "purposes of the Act as it now stands are not served by granting standing

to holders of securities who, according to the averments of their own complaint, neither purchased nor sold stock during the period of defendant's alleged fraud. . . . [A] cause of action does not lie under § 10(b) and Rule 10b-5 on behalf of a person who, whatever loss he may have sustained in the value of his shares, merely held his stock throughout the period of the defendant's misrepresentations"). The reason for this rule is that when the truth "enter[s] the market," it "dissipate[s] the effects of the misstatements," and "those who traded . . . shares after the corrective statements would have no direct or indirect connection with the fraud." *Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988). (*See* Defs.' Reply Mem. in Support of Their Mot. To Dismiss at 8–9.)

In sum, to have standing under § 10(b), plaintiffs must have alleged that they made an actual purchase or sale of JPMC shares during the time in which the market was allegedly defrauded by the omissions and misstatements alleged in their Complaint. That period was from January 14, 2004, when the merger was announced, to June 27, 2004, when plaintiffs allege the *New York Times* revealed the truth to the public. Because neither plaintiff made a purchase or sale during that period, longstanding Seventh Circuit and Supreme Court precedent requires dismissal of their claims for lack of standing.

## II. THE COURT SHOULD RECONSIDER PLAINTIFFS' CLAIMS IN LIGHT OF THE SUPREME COURT'S RECENTLY ANNOUNCED STANDARD FOR PLEADING STATE OF MIND.

To state a claim under § 10(b) or under § 14(a), plaintiffs must allege "with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). In ruling on defendants' Motion with respect to plaintiffs' state-of-mind allegations, the Court expressly applied the Seventh Circuit's interpretation of the "strong inference" requirement as set forth in *Makor*. (Op. at 16.) Significantly, the Seventh Circuit's standard did not permit District Courts to evaluate and weigh

all competing inferences, culpable and nonculpable, in making the ultimate determination of whether the inference of a culpable mental state was "strong." *Makor*, 437 F.3d at 602. Instead, the Seventh Circuit essentially required a District Court to draw all reasonable inferences in a plaintiff's favor and then ask only if a reasonable person "could" find a culpable state of mind based on those favorably drawn inferences.

On June 21, 2007, the Supreme Court reversed the Seventh Circuit's *Tellabs* decision, holding that its standard was inappropriately lax. The Supreme Court held that it was not sufficient for a District Court considering a motion to dismiss under the PSLRA to assess whether state of mind "could" potentially be inferred by a reasonable person, i.e., whether the complaint alleged facts from which a culpable state of mind is "merely plausible or reasonable." 168 L. Ed. 2d at 187–88. Instead, for the inference to be "strong," it must be such that a "reasonable person *would* deem the inference of scienter *cogent and at least as compelling as any opposing inference* one could draw from the facts alleged." *Id.* at 193 (emphasis added). The Court also rejected the Seventh Circuit's view that a District Court must not compare and weigh the strength of potentially competing inferences, including competing nonculpable inferences. Instead, the Court held such an evaluation is *required* under the statute. As the Court explained, the PSLRA requires that a District Court "must" undertake a "comparative evaluation" of "plausible nonculpable explanations for the defendant's [alleged] conduct, as well as inferences favoring the plaintiff," and may allow a claim to proceed only if a resulting inference is "powerful." *Id.* at 187, 193.

While this Court found that plaintiffs' scienter and negligence allegations survived under the standard previously prevailing in the Seventh Circuit, plaintiffs' allegations cannot survive under the standard now established by the Supreme Court. (*See* Defs.' Mot. for Leave to Submit Subsequent Binding Auth. [DE 205] at 3–5.) Many are founded on speculation

7

that does not even find support in the various newspaper articles and public statements plaintiffs use in attempting to support their claims. For example, plaintiffs' allegation of scienter as to James Dimon is based on a claim, with no supporting facts whatsoever, that Mr. Dimon pursued the merger on behalf of Bank One because "he was not content to lead a Midwestern bank" and "sought to reclaim the mantle of Wall Street superstar." (CAC ¶ 72.) Plaintiffs cite no facts in support of this claim nor do they base it on any public statements or media reports. Plaintiffs simply made it up. Such an allegation is not entitled to be credited under the PSLRA because it is not "at least as compelling" as the "plausible nonculpable explanations" for why Mr. Dimon pursued the merger.

Those "plausible nonculpable explanations" are set forth in great detail in a section of the Joint Proxy Statement titled "Bank One's Reasons for the Merger." (Ex. A at 42–45.)[1] Among other reasons given for seeking to merge with JPMC, the stated reasons for the merger include: (i) "the scale, scope, strength and diversity of operations, product lines and delivery systems that could be achieved by combining Bank One and JPMorgan Chase," (ii) "JPMorgan Chase's market leadership in wholesale financial services," (iii) "the complementary nature of the respective customer bases, business products and skills of Bank One and JPMorgan Chase, which could be expected to result in opportunities to obtain synergies as products are cross-marketed and distributed over broader customer bases and best practices are compared and applied across businesses," and (iv) "the potential cost saving opportunities, currently estimated to be approximately $2.2 billion pre-tax annually when fully phased-in." (*Id.*) When these reasons are weighed against unsupported speculation that Bank One pursued the merger so that

---

[1] As a document referred to in plaintiffs' complaint and central to their claim, the Proxy Statement may be considered in deciding a motion to dismiss. *See Continental Cas. Co. v. American Nat'l Ins. Co.*, 417 F.3d 727, 731 (7th Cir. 2005).

8

Mr. Dimon could "reclaim the mantle of Wall Street superstar," the latter cannot credibly be taken as a "useful indicator" of scienter, as this Court did in considering the allegation under the pre-*Tellabs* PSLRA standard.

Similarly, plaintiffs speculate that William Harrison negotiated the merger to increase his incentive compensation (CAC ¶¶ 49–55, 68) or to gild his reputation (CAC ¶¶ 59, 68, 143). The Court credited these allegations as "useful indicators" of scienter without determining whether they were "at least as compelling" as nonculpable competing inferences. They are not.[2] JPMC's reasons for seeking to merge with Bank One are set forth in a section of the Proxy Statement titled "JPMorgan Chase's Reasons for the Merger" and include (i) "enhanced positions in retail financial services," (ii) "more balanced business mix and greater geographic diversification," (iii) "enhanced opportunities for wholesale and other financial services businesses," and (iv) "expected financial synergies." (Ex. A. at 37–42.) Plaintiffs offer no facts other than their own speculation in support of their contention that incentive compensation and prestige were more important motivators for Mr. Harrison than these stated reasons.

Plaintiffs' speculation that Mr. Harrison and Mr. Dimon agreed to the two-year CEO transition period because they made a "backroom deal" (CAC ¶ 9) to help Mr. Harrison "shape a graceful exit for himself" (CAC ¶ 143) is not "at least as compelling" as the competing

---

[2] Additionally, while the Court correctly observed that motive is a "useful indicator" of scienter, incentive compensation and reputational concerns are not a "useful indicator" of motive. The law is well-settled that "a desire to increase incentive compensation, or similar factors that would be true for nearly all corporate executives," cannot be used to establish motive. *Stephenson v. Hartford Life & Annuity Ins. Co.*, No. 02-3917, 2003 U.S. Dist. LEXIS 17036, *25 (N.D. Ill. Sept. 25, 2003); *see also Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1130–31 (2d Cir. 1994); *In re Loral Space & Communs. Ltd. Sec. Litig.*, No. 01-4388, 2004 U.S. Dist. LEXIS 3059, *21 (S.D.N.Y. Feb. 27, 2004) (holding that the desire "to protect his professional reputation" or to "protect their executive positions and compensation and prestige" cannot be cited to establish motive).

9

inference, set forth in the same *New York Times* article that is the basis of plaintiffs' claims, that Mr. Harrison remained CEO "to secure a smooth transition." (CAC ¶ 10.) This non-culpable inference is especially compelling in light of the disclosure in the Proxy Statement that JPMC's Board placed particular importance on "CEO succession, continuity of senior management, and effective and timely integration of the two companies' operations" in resolving corporate-governance issues. (*See* Defs.' Mem. in Support of Their Mot. To Dismiss at 1.)

This Court also held that the plaintiffs had "allege[d] sufficient facts regarding the interaction between the Directors and Harrison and Dimon to support an inference that the Director Defendants 'knew or should have known' about the [alleged] no-premium offer." (Op. at 15.) Under *Tellabs*, it is insufficient that the plaintiffs' allegations merely can "support an inference" of negligence. The inference must be "more than merely plausible or reasonable"; it must be "at least as compelling as any opposing inference." *Tellabs*, 127 S. Ct. at 2505. Moreover, the inference must be created as to each defendant individually—not merely as to all the director defendants as a group. "The Supreme Court did not . . . disturb the Seventh Circuit's requirement that plaintiffs must create the strong inference of scienter 'with respect to each individual defendant in multiple defendant cases.'" *Roth* v. *OfficeMax, Inc.*, No. 05-0236, 2007 U.S. Dist. LEXIS 76011 (N.D. Ill. Sept. 26, 2007) (*quoting Tellabs*, 127 S. Ct. at 2511 n.6; *Makor*, 437 F.3d at 603). The plaintiffs here do not satisfy this standard because they never distinguish one director defendant from another, instead making substantive allegations against them as a group. (*See* CAC ¶¶ 78, 91, 268–70.)

As to defendant J.P. Morgan Securities ("JPMSI"), plaintiffs theorize that JPMSI opined that the merger was "fair from a financial point of view" based on its desire to receive a fee for its work (CAC ¶¶ 170–75), and to protect its position in banking prestige rankings (CAC ¶¶ 170–74). Neither is adequate to state a motive, *see supra* n. 3, nor are they "at least as

compelling" as the opposing inference, as disclosed in the Proxy Statement, that JPMSI reached its opinion based on, among other things, its (i) comparison of "the proposed financial terms of the Merger with the publicly available financial terms of certain transactions involving companies we deemed relevant and the consideration paid for such companies," and (ii) review of "certain internal financial analyses and forecasts prepared by the managements of the Merger Partner and the Company relating to their respective businesses, as well as the estimated amount and timing of the cost savings and related expenses expected to result from the Merger."

### III. THE COURT ERRED IN FINDING THAT PLAINTIFFS' INADEQUATE ALLEGATIONS WERE CORROBORATED BY OTHER FACTS.

In finding that plaintiffs had adequately pleaded scienter as to J.P. Morgan Securities Inc. ("JPMSI"), the Court accepted plaintiffs' misleading characterization of a chart included in the Joint Proxy Statement summarizing JPMSI's analysis that a hypothetical exchange ratio implied by various measures of JPMC's and Bank One's values would range between 1.056:1 and 1.148:1, before accounting for any premium. (CAC ¶ 116.) Because the exchange ratio agreed upon by the parties was 1.32:1 (outside this range), plaintiffs leapt to the conclusion that "the Merger exchange ratio exceeded the highest point in the range of reasonableness and/or fairness, based on a comparison against exchange ratios implied from various other metrics." (CAC ¶ 117.) In accepting this allegation, the Court stated that plaintiffs "allege facts that suggest that the Merger exchange ratio exceeded a range of reasonableness under various objective metrics." (Op. at 18.)

Plaintiffs' assumption that the range in the chart represents a "range of reasonableness" is not a reasonable inference that can be drawn from the facts alleged. (*See* Defs.' Mem. in Support of Their Mot. To Dismiss at 11; *St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n.2 (7th Cir. 1997) (noting that the court "is not required to draw unreasonable inferences from the evidence").) The purpose of JPMSI's analysis was not to set a

11

range of reasonableness, but, as explained in the Proxy Statement, to "calculate[] the premiums that the exchange ratio of 1.32 for the merger represents over the average exchange ratios" implied by various measurements. (Ex. A at 52.) Nothing in the chart or anything else in the Proxy Statement characterized those "average exchange ratios" as a range of reasonableness. Indeed, *any premium at all* would have led to an exchange ratio higher than the "average exchange ratios" in the chart, since a premium, by definition, is a surplus over market value. Plaintiffs' misrepresentation of JPMSI's chart, and the Court's reasoning accepting it, would lead to the *reductio ad absurdum* that the payment of a premium in a merger by itself raises a strong inference of scienter to commit securities fraud. This error in fact warrants reconsideration.[3]

---

[3] Additionally, the Court relied on "evidence of email correspondences, other articles and related documents" which plaintiffs (falsely) characterized as corroborating their claims. (Op. at 10.) "Generally, all documents to be considered in a motion to dismiss must be contained within the pleadings." *Covenant Media v. City of Calumet City*, No. 05-0214, 2005 U.S. Dist. LEXIS 17726 (N.D. Ill. Aug. 19, 2005); *accord Thompson v. Ill. Dep't of Prof. Regulation*, 300 F.3d 750, 754 (7th Cir. 2002). But these "email correspondences" and "related documents" were neither "contained within the pleadings" nor "referred to in the plaintiff's complaint and . . . central to his claim." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994). In that situation, the Court should have ignored the material or converted the motion into one for summary judgment, *see* FED. R. CIV. P. 12(b)(7), which could not be decided before defendants were provided the opportunity to submit "additional evidentiary material of [their] own" in support of their motion. *Venture Assoc. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). Furthermore, the documents cited by the Court were obtained by plaintiffs during discovery. Plaintiffs' counsel was permitted to participate in discovery only under the stipulation that "he would not be using the discovery to amend his pleadings." (Tr. of Proceedings Before the Hon. David H. Coar, Sept. 18, 2006, at 16 (Ex. B).) Plaintiffs' submission of this discovery material to the Court to help them overcome defendants' motion to dismiss violates the spirit, if not the letter, of that agreement.

## CONCLUSION

For the foregoing reasons, defendants respectfully request the Court reconsider its December 18, 2007 Opinion denying in part defendants' motion to dismiss.

Respectfully submitted,

/s/ Kathleen L. Roach
Kathleen L. Roach
Courtney A. Rosen
Matthew B. Kilby
Matthew R. Lyon
SIDLEY AUSTIN LLP
1 S. Dearborn
Chicago, Illinois 60603
(312) 853-7000

*Counsel for Defendants*

OF COUNSEL:

Sharon L. Nelles
Suhana S. Han
Keith Levenberg
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-3712

*Counsel for Defendants*

Nancy E. Schwarzkopf
JPMORGAN CHASE LEGAL DEPARTMENT
1 Chase Manhattan Plaza, 26th Floor
New York, New York 10081
(212) 552-3585

*Counsel for Defendant J.P. Morgan Chase & Co.*

Julie A. Lepri
JPMORGAN CHASE LEGAL DEPARTMENT
10 S. Dearborn
Chicago, Illinois 60603
(312) 732-7354

*Counsel for Defendant J.P. Morgan Chase & Co.*

Date: January 14, 2008

CH1 4124590v.1