**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE JPMORGAN CHASE & CO. SECURITIES LITIGATION | MDL No. 1783<br>HONORABLE DAVID H. COAR |
| This document relates to: | Master Docket No. 06 C 4674 |
| *Hyland v. Harrison*,<br>C.A. No. 06 C 4675 | CLASS ACTION |
| *Hyland v. J.P. Morgan Securities, Inc.*,<br>C.A. No. 06 C 4676 | |

**LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR RECONSIDERATION**

Lead plaintiffs Samuel Hyland and Stephanie Speakman ("Plaintiffs") respectfully submit this opposition to defendants' Motion for Reconsideration (D.E. #241).

**PRELIMINARY STATEMENT**

Defendants' motion for reconsideration was filed well after the deadline for Rule 59(e) motions and defendants have not even attempted to articulate a basis for relief under Rule 60(b). This failure is telling, because under the applicable legal standard it is obvious that defendants are not entitled to relief. Defendants' motion merely rehashes the same tortured arguments previously rejected by the Court, mischaracterizes the Court's well-reasoned opinion, and misstates the law. Accordingly, the motion should be denied.

**ARGUMENT**

**I.   Defendants' Have Failed To Articulate
Any Basis For Relief Under Rule 60(b)**

Defendants' motion is not timely under Rule 59(e) and therefore must be reviewed under Rule 60(b).[1]  *See Mirza v. Barnhart*, 2003 WL 21058542 (N.D. Ill. May 8, 2003) (evaluating a

---

[1] This Court's decision on defendants' motion to dismiss was docketed on December 19, 2007. The "strict" ten-day deadline (not including weekends or holidays) for a Rule 59(e) motion for reconsideration was January 4, 2008.  *See Helm v. Resolution Trust Corp.*, 43 F.3d 1163, 1166 (7th Cir. 1995) (explaining bright-line rule and holding that "[t]he time of a motion's . . . [filing] controls whether a motion challenging a judgment is a 60(b) or 59(e) motion."). Defendants filed their motion on January 14, 2008, well after the Rule 59(e) deadline.

motion for reconsideration under Rule 60(b) because it was filed more than ten days after the judgment) (attached hereto as Ex. A).  Reconsideration pursuant to Rule 60(b) is "'an extraordinary remedy and is granted only in exceptional circumstances.'" *Id.* at *2 (quoting *Mares v. Busby*, 34 F.3d 533, 535 (7th Cir. 1994)).  Furthermore, "district court judges should not be burdened with 'agonizing' over whether a motion for reconsideration asserts grounds for relief included in Rule 60(b), because it is the movant's task to make its Rule 60(b) contentions clear." *Ibid.* (citing *United States v. Deutsch*, 981 F.2d 299, 302 (7th Cir. 1992)).  Nevertheless, in complete disregard of this principle, defendants' motion for reconsideration does not even cite Rule 60(b) and is utterly silent as to whether the relief sought can be achieved through that rule's provisions.[2]

Furthermore, the law is clear that courts will not grant reconsideration under Rule 60(b) merely to address purported legal errors.  For example, after the court in *Mirza* determined that movant's only arguments pointed to purported errors of law (a plausible ground for relief under Rule 59(e), but not Rule 60(b)), the motion for reconsideration was denied.  *Ibid*.  *See also Cash v. Illinois Div. of Mental Health*, 209 F.3d 695, 698 (7th Cir. 2000) (stating that a Rule 60(b) motion "is not an alternate route for correcting simple legal errors"); *Talano v. Northwestern Med. Faculty Found., Inc.*, 273 F.3d 757, 762 (7th Cir. 2001) (affirming denial of motion for reconsideration where motion merely suggested the district court made mistakes of law rather than conforming to any grounds specified in Rule 60(b)).

Rule 60(b) permits relief from judgment when it is based on one of six specific grounds listed in the rule.  *See* FED. R. CIV. P. 60(b); *see also Deutsch*, 981 F.2d at 301 (explaining that Rule 60(b) motions "must be shaped to the specific grounds for modification or reversal found in 60(b)").  Defendants' motion is not based on any of the grounds specified in Rule 60(b).  Instead, defendants rehash old arguments and contend that the Court's decision includes errors of law regarding reliance and scienter.  However, Rule 60(b) can only be used to obtain relief from a judgment when there is a defect in that judgment that cannot be remedied through the normal appellate process.  *See Bell v. Eastman Kodak Co.*, 214 F.3d 798, 800-01 (7th Cir. 2000).

---

[2] In *Mirza* – as in this case - the movant "failed to state any Rule 60(b) contentions with specificity or in a clear and straightforward manner, as required by law." *Id.* at *3.  Defendants' failure to even mention the applicable legal standard is speaks volumes – defendants know they can't satisfy it.  Instead they have attempted to obfuscate the issue by concocting a "standing" argument, which, as explained below, is entirely frivolous.

Having neglected to raise any purported errors of law within the prescribed ten-day post-judgment period, defendants must now reserve such arguments for appeal. After all, arguments that a court was in error on the issues it considered should be directed to the court of appeals. *See Refrigeration Sales Co. v. Mitchell-Jackson, Inc.*, 605 F. Supp. 6, 7 (N.D. Ill. 1983). Accordingly, defendants' motion should be denied because it fails to conform to any of the grounds specified in Rule 60(b).

## II.  Defendants' Arguments as to Legal Error Are Wholly Meritless

### A.  The Court Correctly Determined That Plaintiffs Adequately Pleaded Reliance

Part I of defendants' motion is a jumble of repackaged arguments touching upon standing, reliance and loss causation. Parties are not to make motions for reconsideration based upon arguments that have already been made or upon new theories that were previously available. In disregard of these principles, defendants serve up new variations of old arguments (which this Court has already rejected) and a new theory based on an inapposite decision from 1998 that defendants did not even bother to cite in support of their motion to dismiss.

#### 1.  Defendants' Claim That Hyland Lacks Standing Is Frivolous

Defendants' newfound standing argument may be dispensed with easily because defendants expressly concede that Samuel Hyland, one of the Plaintiffs, did sell his JPMorgan stock less than two months after the merger at issue was formally consummated (Defs.' Mot. at 5). In fact, defendants' argument has nothing to do with Article III standing – it is merely the same reliance argument already rejected by the Court.[3]

The purchaser/seller rule in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975) "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." The plaintiff in *Blue Chip Stamps* "was not only not a buyer or seller of any security, but it was not even a shareholder of the corporate

---

[3] Defendants attempt to sidestep their failure to file a timely Rule 59(e) motion by presenting the *Blue Chip* argument as a question of standing that may be raised at any time. However, there is no issue of Article III standing here. The *Blue Chip* purchaser/seller rule is a judicially crafted, prudential standing requirement that is premised on policy grounds, not Article III. The distinction between constitutional and prudential standing is relevant to the necessity of judicial review. *See, e.g., McNamara v. City of Chicago*, 138 F.3d 1219, 1222 (7th Cir. 1998) (finding that because Article III standing was present it could bypass a prudential standing question to reach the merits of the case).

petitioners." *Id.* at 751-52.  Here, in stark contrast, it is *undisputed* that plaintiff Hyland sold his JPMorgan stock, and therefore is a "seller" for the purposes of *Blue Chip Stamps*.  What defendants actually argue is that he did not sell *at the right time* – from their perspective.  Since it is undisputed that one of the Plaintiffs actually sold his stock well before the expiration of the limitations period for Rule 10b-5 claims, the bright-line rule of *Blue Chip Stamps* excluding non-sellers and non-purchasers from asserting Rule 10b-5 claims is not implicated here.[4]  Accordingly, defendants' argument on standing is frivolous.

### 2. Plaintiffs Are Entitled To a Presumption Of Reliance Under Both *Basic* And *Affiliated Ute*

Defendants ignore well-settled presumptions of reliance in securities class actions in their motion.  To further obscure their Rule 59(e) timeliness oversight, defendants indiscriminately mix the straightforward purchaser/seller rule (easily satisfied here) with arguments regarding reliance, even though the issues are distinct.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 84 (2006) (distinguishing *Blue Chip*'s policy-based purchaser/seller rule from analysis of "in connection with the purchase or sale" element).  As noted in *Dabit*, "[t]he *Blue Chip Stamps* Court purported to define the scope of a private right of action under Rule 10b-5—not to define the words 'in connection with the purchase or sale.'"  *Ibid.*

Defendants grossly misread the law on reliance in Rule 10b-5 cases.  Actual reliance by JPMorgan shareholders need not be proven because two judicially recognized presumptions of reliance are applicable on the facts presented: the "fraud-on-the-market" presumption recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and the presumption for omissions-based claims recognized in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

First, Plaintiffs are entitled to rely on the fraud-on-the-market presumption of reliance.  This presumption was first recognized by the Supreme Court in *Basic*, where the Court reasoned that investors that buy or sell stock at the price set by the market do so "in reliance on the integrity of that price," and that because all publicly available information has been reflected in

---

[4] As recently as 2005, the Supreme Court affirmed that it "espoused a broad interpretation" of the phrase "in connection with the purchase or sale."  *Dabit*, *infra*, 547 U.S. at 85.  Since the complaint expressly limits the class entitled to damages under Rule 10b-5 to certain <u>sellers</u> of JPMorgan stock, and defendants themselves point out that plaintiff Hyland sold shares, the rule of *Blue Chip Stamps* is easily satisfied here.

that price, "an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." 485 U.S. at 247. Defendants do not contend that the market for JPMorgan was inefficient or that the fraud-on-the-market presumption of reliance is otherwise rebutted.

Second, in *Affiliated Ute*, the Supreme Court held that in Rule 10b-5 cases premised on omissions by a defendant owing a fiduciary duty of full disclosure to the plaintiff, "positive proof of reliance is not a prerequisite to recovery"; rather, all that is required is that the facts withheld by the defendant are material. 406 U.S. at 153-54. *See also Swanson v. American Consumers Indus. Inc.*, 475 F.2d 516, 521 (7th Cir. 1973). Defendants do not contend that the Court erred in finding that the alleged omission of the no-premium offer satisfied the materiality threshold. Therefore, the *Affiliated Ute* presumption of reliance clearly applies.[5]

In sum, defendants have conjured an extremely narrow view of the "in connection with" requirement that was rejected by the Supreme Court long ago. "Section 10(b) must be read flexibly, not technically and restrictively. Since there was a 'sale' of a security, and since fraud was used 'in connection with' it, there is redress under § 10(b)…." *Superintendent of Ins. v. Banker's Life and Casualty Co.*, 404 U.S. 6, 12 (1971). Defendants ignore the well-settled presumptions of reliance applicable in this case. Further, they have not identified any error of law in the Court's decision. Accordingly, defendants' motion should be denied.

### 3. Defendants' Chronological Argument Relies on False Assumptions

Defendants contend that Plaintiffs did not *purchase* their JPMorgan stock in reliance on any alleged omission or misrepresentation between the Merger announcement and the issuance of the Merger proxy statement. (Defs.' Mot. at 3.) Once again, defendants ignore that the Rule 10b-5 claim is made on behalf of certain *sellers* of JPMorgan stock, not purchasers.

Defendants also contend that JPMorgan shareholders who sold stock after the June 28, 2004 *New York Times* article could not have relied on any alleged omission or misrepresentation. (Defs.' Mot. at 5.) However, this chronological argument fundamentally misapprehends how

---

[5] Neither *Basic*'s fraud-on-the-market presumption of reliance nor the *Affiliated Ute* presumption of reliance is addressed in defendants' motion. Should defendants attempt to rebut either presumption in their reply brief, it is respectfully submitted that such arguments should be disregarded as outside the scope of the reply or that Plaintiffs should be given the opportunity to respond to such arguments in a sur-reply.

JPMorgan's stock price was distorted by defendants' alleged misconduct. Two of the most serious flaws in defendants' reasoning are the implicit assumptions that (1) the truth was fully revealed by the *New York Times* article, and that (2) the *New York Times* article fully dissipated the deflation of JPMorgan's stock price. There is no basis for either assumption, and neither stands to reason.

First, defendants have yet to admit that any no-premium offer was made by Dimon during the merger negotiations. Instead, defendants have repeatedly questioned the basis of the reporting in various submissions (even though internal correspondence reveals that they eagerly cooperated with the *New York Times* reporter and uniformly embraced the article once it was published). However, for defendants to argue consistently that the class period should end with the publication of the June 28, 2004 *New York Times* article, they must *first* posit that the article fully revealed the truth to the market. They have not done so, and thus their argument fails. Defendants cannot deny the accuracy of the *New York Times* article and simultaneously maintain that the market price of JPMorgan's stock reflected the truth once the article was published.

Second, even if the *New York Times* article fully revealed the truth to the market, the dissipation of the stock price deflation would not be expected under the scenario presented. This is not a case in which the intrinsic value of an enterprise is revealed to be overstated, thus triggering a drop in the stock price. Rather, as this Court correctly appreciated, the terms of the merger – in particular, the unfair exchange ratio – caused Plaintiffs' losses. Once the merger was approved and consummated, the unfair exchange ratio was irreversibly embedded into the stock price. The combined company itself was not revealed to be worth less; rather, it was revealed that class members had been duped into receiving 58% of the company, rather than 61%. The *New York Times* article may have put JPMorgan shareholders on notice for the purposes of the statute of limitations, but the information in the article cannot be considered a corrective disclosure under the typical sequence in which artificial inflation is dissipated by a stock drop triggered by a corrective disclosure. As Plaintiffs emphasized previously in response to defendants' motion to dismiss, this is not a stock-drop case, and therefore defendants' repeated efforts to shoehorn this complaint into the stock-drop framework is unavailing.

### 4. *Isquith* is Inapposite

Defendants' reliance on *Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531 (7th Cir. 1998) is misplaced. Procedurally, defendants did not cite *Isquith* in support of their motion to dismiss,

and they thereby waived any re-argument based on that case – in addition to the fact that they cannot obtain relief under Rule 59(e).  Substantively, *Isquith* is inapposite.  That case involved a corporate spin-off in which shareholders initially owned 100% of Baxter International.  After the spin-off they continued to own 100% of Baxter, as well as 100% of Caremark, a spun-off subsidiary.  Indeed, "the market value of Baxter and Caremark stock – the only thing investors would care about – exceeded the value of Baxter stock before the spinoff."  *Id.* at 533.  By contrast, in this case, JPMorgan shareholders owned 100% of the company prior to the merger but only 58% of the post-merger entity, and the market value of JPMorgan stock is alleged to have been significantly lower than it would otherwise have been but for the fraud.  Also, unlike the merger in this case, the spin-off in *Isquith* did not require the consent of the shareholders.  *Ibid.*  Thus, Baxter shareholders were merely passive bystanders.  Indeed, the putative class in *Isquith* was limited to holders (not sellers) of Baxter shares at the time of the spin-off.  *Ibid.*  By contrast, in this case the class seeking damages under Rule 10b-5 is expressly defined as those who held stock of JPMorgan when the merger was announced *who thereafter sold* any or all of their stock.  In *Isquith*, Judge Posner identified "[t]he biggest problem with the suit" as the fact that "[t]he members of the class did not buy or sell shares in Baxter [or Caremark]."  *Id.* at 534.  Whereas the class members in *Isquith* "made no investment decision," the Rule 10b-5 claim in this case is asserted only on behalf of those JPMorgan shareholders who <u>did</u> make the investment decision to sell JPMorgan stock.  *Ibid.*  They sold at a market price that was distorted by the fraud, and their reliance on the integrity of the market price is presumed under *Basic*.  Alternatively, their reliance is presumed under *Affiliated Ute* since this is primarily an omissions-based case.  Either way, the element of reliance is adequately pleaded, and *Isquith* does not suggest anything to the contrary.

### B. The Court Correctly Determined That Plaintiffs Pleaded Facts Sufficient To Give Rise To A Strong Inference Of Scienter

Defendants contend that the Court erred with respect to the legal standard for pleading scienter.  However, the Court's scienter analysis is entirely consistent with the standard set forth in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007).[6]  It is clear from the

---

[6] Plaintiffs submitted *Tellabs* to the Court on June 25, 2007.  (D.E. #189.)  Defendants subsequently moved to present additional arguments based on *Tellabs* on August 15, 2007.  (D.E. #205.)  At a hearing on defendants' motion, the Court stated: "If you folks want to start all

opinion's detailed and thoughtful analysis of the complaint that the Court applied the appropriate legal standard in reviewing the allegations of scienter.

In *Tellabs*, the Supreme Court established a three-step approach to evaluating scienter allegations. *See id.* at 2509-10 (setting forth steps). "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511. This analysis requires a court to "consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 2510. However, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences[.]'" *Ibid* (citations omitted). Rather, scienter allegations will suffice if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Ibid*.

As the Court recognized in its decision, the complaint identifies public statements made by defendants Harrison and Dimon at the investor conference call conducted shortly after the announcement of the merger from which their scienter can readily be inferred. (Mem. Op. at 16-17.) Analysts on the conference call specifically asked Harrison and Dimon: (i) why the CEO and Chairman positions were not being split between the two; and (ii) why Dimon didn't push to be CEO immediately. (*See* Consolidated Class Action Complaint ¶¶ 134-41.) In response, both Harrison and Dimon *intentionally* provided misleading answers which omitted the truth. (*Ibid.*) The only reasonable inference to be drawn from this intentional deception is that Harrison and Dimon knew that answering these questions honestly and completely would jeopardize their backroom deal – *i.e.*, Harrison and Dimon possessed the requisite intent to deceive, demonstrated by knowledge of their statements' misleading nature. Indeed, notwithstanding the comparative strength analysis established by *Tellabs*, defendants' have failed to suggest **any** competing non-

---

over again and rebrief [the motion to dismiss] within the 15-page limit, that's fine. But if you don't, then you can give me the [*Tellabs*] case, but I won't entertain argument. I'll strike the [m]otion and any argument attached." (Tr. of Proceedings Before the Hon. David H. Coar, Aug. 30, 2007 (Ex. B).) The response of defendants' attorney was unequivocal: "I think the Court's consideration of the case by itself is sufficient, Your Honor, in light of what we've stated in our motion to dismiss." Yet now defendants seek to sneak in the backdoor all the additional arguments that they presented previously. They elected not to re-brief the motion to dismiss when given the opportunity to do so, but now they seek to do just that through an untimely motion for reconsideration.

culpable inferences which could reasonably be drawn in such circumstances.  *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."); *Selbst v. McDonald's Corp.*, 432 F. Supp. 2d 777, 786-87 (N.D. Ill. 2006) (allegations that defendants had "actual knowledge" of non-public information suggesting that public statements were inaccurate or misleading constitute "classic evidence of scienter").

      Defendants have completely avoided the damning public statements by Dimon and Harrison and they certainly have not offered any plausible non-culpable inference that could justify such evasive and misleading answers.  Instead, defendants have once again pointed to self-serving boilerplate in the proxy statement, apparently directed to the "motive and opportunity" allegations.  However, this does not explain (in a non-culpable way) why Harrison and Dimon lied and dissembled at the merger conference call.  Such dishonesty is the most compelling manifestation of scienter.  These scienter allegations suffice because "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id*. at 2510.

      On remand, the Seventh Circuit applied the Supreme Court's newly enunciated standard to find that the scienter allegations at issue were adequate.  *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 2008 WL 151180 (7th Cir. Jan. 17, 2008) ("*Tellabs II*").  In an opinion by Judge Posner, the court held that because the alleged false or misleading statements concerned Tellabs' most important products and a significant amount of alleged channel-stuffing, it was much more likely that the statements were the result of an intent to deceive or recklessness on the part of management rather than "merely careless mistakes at the management level based on false information fed it from below."  The court also held that the CEO's position, coupled with the important nature of the products and his statements concerning them, combine to add yet another bolstering factor to a strong inference of the requisite scienter.  The multi-layered and fact-specific reasoning exemplified in *Tellabs II* further validates the analysis undertaken by the Court in this case.  Viewing the allegations collectively, this Court correctly appreciated how the

extensive allegations of motive and opportunity bolstered the powerful evidence of scienter provided by evasive and misleading public statements by Dimon and Harrison.[7]

In sum, the fact of the no-premium offer must be accepted as true at this stage. *See Tellabs*, 127 S. Ct. at 2509. The "strong inference" standard does not apply to that fact. As to the state of mind of defendants Harrison and Dimon, no amount of misdirection should distract the Court's focus from their damning public statements. The extensive allegations of motive and opportunity in the complaint buttress the evidence of scienter from the defendants' own words. Taken collectively, Plaintiffs' scienter allegations satisfy the *Tellabs* standard. Defendants have not articulated any legal basis for reconsideration and are attempting to relitigate the scienter element even though the Court already correctly decided the issue.

### C. The Court Correctly Decided That Plaintiffs Stated a Viable Claim Against JPMSI

Defendants do not dispute this Court's ruling with respect to the imputation of scienter to JPMSI, *i.e.*, the "subjective falsity" prong of a claim that JPMSI's fairness opinion was materially false and misleading. However, they contend that the Court erred in accepting the viability of Plaintiffs' allegation that JPMSI's fairness opinion was objectively false based on the fact that the Merger exchange ratio was substantially higher than the exchange ratios implied by several financial metrics. Plaintiffs' allegations indicate that there was no economic justification for the exchange ratio blessed as fair by JPMSI. Yet defendants argue that this is not a reasonable inference, even though the Complaint alleges a wide variety of facts suggesting that the financial allocation in the Merger uniformly benefited Bank One shareholders to the detriment of JPMorgan shareholders without any economic justification. (*See, e.g.,* Complaint ¶¶ 111, 116, 118, 120.) Indeed, with the exception of one bank merger in 1999, the immense premium in the Merger was virtually unprecedented. (*See id.* ¶ 120.) Based on these allegations, Plaintiffs are entitled to contest the integrity and basis of JPMSI's fairness opinion and establish "objective falsity." *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1094 n.6 (1991) ("[A] proxy statement's claim of fairness presupposes a factual integrity that federal law is expressly

---

[7] Defendants accuse Plaintiffs of simply inventing the motive allegations regarding Dimon's desire to head a Wall Street financial institution. (Defs.' Mot. at 8 ("Plaintiffs cite no facts in support of this claim nor do they base it on any public statements or media reports.").) To the contrary, Plaintiffs cite several public reports and other publicly-available information in support of this motive. (*See, e.g.,* Complaint ¶¶ 70, 77, 82, 84, 86, 97-98, 124.)

concerned to preserve."). JPMSI may defend the factual basis for its fairness opinion and seek to prove that its bankers actually believed the opinion. But the question of proof is separate and apart from the question of viability. Accordingly, the Court's decision as to the viability of claims against JPMSI is free from legal error and defendants' motion should be denied.

### D.   Defendants' Request for Rule 56 Treatment Should Be Deferred Until After the Completion of Discovery

In a novel twist, defendants now seek conversion of the motion to dismiss into a summary judgment motion (Defs.' Mot. at 12 n.3) – which would necessitate the very discovery that defendants seek to avoid. Plaintiffs welcome defendants' invitation to test their claims under Rule 56 *after* the completion of discovery.

### CONCLUSION

For the reasons above, defendants' motion for reconsideration should be denied.

DATED:      February 11, 2008          Respectfully submitted,

/s/ *Joseph N. Gielata*
JOSEPH N. GIELATA
ATTORNEY AT LAW
501 Silverside Road, No. 90
Wilmington, Delaware 19809
(302) 798-1096

*Counsel for Lead Plaintiffs*