IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE JPMORGAN CHASE & CO. SECURITIES LITIGATION | : : : : | MDL No. 1783 |
| This document relates to: *Hyland* v. *Harrison et al.*, Civil Action No. 06-4675  *Hyland* v. *J.P. Morgan Securities Inc.*, Civil Action No. 06-4676 | : : : : : : : : : : : | Master Docket No. 06-4674 Hon. David H. Coar |

**DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF
RECONSIDERATION OF THEIR MOTION TO DISMISS THE COMPLAINT**[1]

Plaintiffs' opposition ("Opp.") to defendants' motion for reconsideration clarifies that plaintiffs base their purported standing to assert a § 10(b) claim on a single stock sale by Mr. Hyland that could not have been induced by any alleged misstatement by defendants. No claim under § 10(b) is cognizable in such circumstances. Plaintiffs also concede that the appropriate pleading standard for evaluating the sufficiency of their state-of-mind allegations under the PSLRA is the one set forth in *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007): whether a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Finally, contrary

---

[1] Defendants submit this response pursuant to the Court's January 18, 2008 minute entry setting the briefing schedule on defendants' motion for reconsideration. Defendants wish to inform the Court that the parties to this action have entered into a Memorandum of Understanding to enter into a global settlement agreement on substantially the same terms as those entered into in the matter captioned *Blau* v. *Harrison*, No. 04-6592. The parties are in the process of drafting that agreement now.

to plaintiffs' assertion, defendants' motion filed pursuant to common law — not Federal Rule of Civil Procedure 59(e), which is inapplicable here — is timely.

**I.    Plaintiff's Single Stock Sale After the Merger and After the Alleged Truth About the Merger Was Revealed to the Market Does Not Confer Standing to Assert a § 10(b) Claim.**

Plaintiffs do not dispute that neither one of them bought or sold JPMC stock from January 14, 2004 to June 27, 2004, the period of the alleged misstatements. Ms. Speakman is never alleged to have sold her shares, and thus the Court should find that, as a mere "holder," she lacks standing to sue under § 10(b). Mr. Hyland is alleged to have sold JPMC stock on August 13, 2004. On the basis of this single sale, plaintiffs characterize defendants' argument that Mr. Hyland lacks standing to assert a § 10(b) claim as "frivolous." But contrary to plaintiffs' position, it is not true that anyone who sold stock, at any time, "is a 'seller' for the purposes of *Blue Chip Stamps*" and standing under § 10(b). (Opp. at 4.) The rule of *Blue Chip Stamps* "holds that a plaintiff in a Rule 10b-5 case has standing to sue only if a fraudulent activity caused him to buy or to sell stock." *Marsh* v. *Armada Corp.*, 533 F.2d 978, 981 (6th Cir. 1976). Thus, the dates on which a plaintiff bought or sold his stock are of critical importance. If plaintiffs were not induced to buy stock by the alleged fraud, and were not induced to *sell* stock by the alleged fraud, then the alleged fraud is not "in connection with the purchase or sale of a security," as required by § 10(b) and Rule 10b-5.

Plaintiffs miscast defendants' argument by characterizing it solely as a reliance argument and claim that they "are entitled to rely on the fraud-on-the-market presumption of reliance." (Opp. at 4.) Plaintiffs are wrong, and misapprehend what the presumption entails. The fraud-on-the-market presumption of reliance entitles "an investor who buys or sells shares at the price set by an efficient market . . . to a rebuttable presumption that she traded in reliance on any public material misrepresentations." *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 553

2

(N.D. Ill. 2007). This merely means that *if* a purchase or sale of securities occurs after a misstatement is made but before it is corrected, the purchaser or seller can be presumed to have relied on that misstatement. Such a presumption, however, does not confer standing to Mr. Hyland, who did *not* buy or sell shares during a period in which there were "any public material misrepresentations." *Id*. "[S]tanding is not accorded to a plaintiff if his purchase or sale occurs before the alleged fraudulent conduct, or after the alleged fraudulent conduct was exposed." *Marsh*, 533 F.2d at 982 n.3. Plaintiffs here have failed to allege that they purchased stock *after* defendants made the alleged misrepresentations, or that they sold stock *before* those alleged misrepresentations were corrected. Such failure means not only that they could not have relied on those statements, but also that those statements could not have been "in connection with" plaintiffs' purchases or sales.

Plaintiffs argue that Mr. Hyland's August 13, 2004 stock sale could still be "in connection with" the alleged misrepresentations supposedly corrected by the June 27, 2004 *New York Times* article if "the truth was [not] fully revealed by the *New York Times* article." (Opp. at 6.) But plaintiffs' entire case is premised on the "truth" of the *New York Times* article. Nowhere do plaintiffs allege that there are additional omitted or misrepresented material facts about the merger that were not reported by the *Times* or otherwise revealed to the public before August 13, 2004. Nor do plaintiffs explain how Mr. Hyland's August 13, 2004 stock sale was "in connection with" any omission or misrepresentation of any such additional facts.

Next, plaintiffs argue that "even if the *New York Times* article fully revealed the truth to the market, the dissipation of the stock price deflation would not be expected under the scenario presented . . . [because] the unfair exchange ratio was irreversibly embedded into the stock price." (Opp. at 6.) This argument sidesteps the question whether such a "scenario" can be remedied by § 10(b). *Isquith* v. *Caremark Int'l, Inc.*, 136 F.3d 531 (7th Cir. 1998), has clearly

3

answered this question in the negative.  *Isquith* stands for the proposition that "a suit for securities fraud" is *not* a legal remedy for "fundamental changes in a corporation's structure that are undertaken in bad faith and hurt the shareholders."  *Id*. at 536.  Rather, "[t]he office of securities fraud is to protect investors from being induced to make unsound sales or purchases by misrepresentations or misleading omissions."  *Id*.  There was no such purchase or sale here, and plaintiffs' efforts to distinguish *Isquith* are unavailing.

First, plaintiffs point out that *Isquith* involved a spinoff as opposed to a merger.  This is a distinction without a difference that does nothing to undermine *Isquith*'s pertinence to situations where plaintiffs allege that it is a corporate transaction, rather than their own transactions in the corporation's stock, that caused their alleged damages.

Second, plaintiffs cite *Isquith*'s statement that "the market value of Baxter and Caremark stock — the only thing investors would care about — exceeded the value of Baxter stock before the spinoff."  136 F.3d at 533.  Plaintiffs contrast this with their own allegation that "JPMorgan shareholders owned 100% of the company prior to the merger but only 58% of the post-merger entity." (Opp. at 7.)  This is not a distinction of *Isquith*; it is in fact analogous to it.  Although JPMC shareholders own a smaller percentage of the company than they did before the merger (which is fundamentally true of *any* merger), "the market value of [JPMC] stock," not the proportion of the company that stock represents, is, as in *Isquith*, "the only thing investors would care about."  136 F.3d at 533.

Third,  plaintiffs state that here, "the market value of JPMorgan stock is alleged to have been significantly lower than it would otherwise have been."  (Opp. at 7.)  This, too, is analogous to *Isquith*, where the plaintiffs claimed that but for the spinoff, "Baxter stock would . . . today be worth more than the current combined value of Baxter and Caremark stock."

4

136 F.3d at 533.  Notably, plaintiffs do not allege that JPMC's stock actually went down — only that it would have gone up even more than it did.

Finally, plaintiffs state that "the spin-off in *Isquith* did not require the consent of the shareholders," who were "merely passive bystanders." (Opp. at 7.)  In fact, while the spinoff did not require a shareholder vote, *Isquith* makes plain that they were anything but passive bystanders.  The *Isquith* plaintiff's claims were based on the theory that "had the true purpose of the spinoff been revealed, owners of Baxter shares could have gotten the courts to block it." 136 F.3d at 533.  The presence of the shareholder vote in this case merely means that plaintiffs would be entitled to bring suit under § 14(a) on the basis of any material misrepresentations in the proxy solicitation, as they have done.  Indeed, any injuries as a result of statements inducing that vote, as opposed to statements inducing their trades, must be remedied by § 14(a) — not § 10(b), under which plaintiffs lack standing.

## II. Two Alleged Statements By Mr. Harrison and Mr. Dimon Regarding the CEO Succession Arrangement Do Not Raise a Strong Inference of Scienter.

Plaintiffs do not dispute that the Supreme Court's decision in *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), supplies the applicable pleading standard for their claims.  Rather, plaintiffs argue that they have pleaded scienter in a manner consistent with *Tellabs* on the basis of "public statements made by defendants Harrison and Dimon at the investor conference call conducted shortly after the announcement of the merger." (Opp. at 8.)  Because plaintiffs do not purport to identify any other facts that raise the strong inference of scienter as to Messrs. Harrison and Dimon required by *Tellabs*, it is worth examining these statements closely.[2]

---

[2]    As to defendant J.P. Morgan Securities Inc. ("JPMSI"), plaintiffs attempted to raise a strong inference of scienter with a chart allegedly demonstrating that the merger exchange ratio was outside JPMSI's "range of reasonableness."  That chart does nothing

The first such statement is Mr. Harrison's answer to the question, "[W]hy are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have Jamie be CEO right away? What was your thought process there?" Mr. Harrison responded:

> It's all part of creating a structure in a negotiation process that works for both firms. I am 60 years old. I have at least a couple of years left to produce value and we think this is a good balance. And as I said before, I will stay around as Chairman as long as Jamie wants me.

(CAC ¶ 134–135.)

The second statement is Mr. Dimon's response to the question, "[Y]ou talked about the fact that you are going to become CEO in two years. The question is obviously, why you didn't decide to move for that now, as you know, things can change a lot in two years based on your experience?" Mr. Dimon responded:

> You've got to think a little bit that these are two large organizations coming together. You want the teams to meld. I have a lot to learn there. Bill and I have known each other a long time so we feel pretty comfortable about this and I'm convinced this will work.

(CAC ¶ 137–38.)

Plaintiffs argue that these statements were inaccurate because, they contend, Messrs. Harrison and Dimon *really* agreed to the succession arrangement as part of a "backroom deal whereby Harrison agreed to a Merger exchange ratio providing for a massive premium over

---

more than show what the exchange ratio would have been but for the premium. The chart has no "range of reasonableness." (*See* Defs.' Mot. at 11–12.) Plaintiffs apparently now abandon their argument with respect to this chart. Plaintiffs also ignore that the complaint's allegations as to the Director Defendants constitute improper "group pleading." *Tellabs* "did not . . . disturb the Seventh Circuit's requirement that plaintiffs must create the strong inference of [a culpable mental state] 'with respect to each individual defendant in multiple defendant cases.'" *Roth* v. *OfficeMax, Inc.*, No. 05-0236, 2007 U.S. Dist. LEXIS 76011 (N.D. Ill. Sept. 26, 2007).

6

Bank One's market value — solely so he could retain his CEO position for two more years." (CAC ¶ 9.) But the only facts plaintiffs cite to draw the requisite strong inference that Mr. Harrison and Mr. Dimon made such a "backroom deal" are the above statements, on the basis that they omitted to mention the "backroom deal." The circularity of this logic is obvious and should be rejected. By the same logic, plaintiffs could invent any "fact" they like, no matter how outlandish, and point to the fact that defendants did not disclose it as evidence of "intentional deception."

Furthermore, even before *Tellabs* raised the bar for pleading fraud, courts rejected the notion that one could draw a strong inference of fraud merely by alleging that defendants intentionally omitted a material fact. In *L.L. Capital Partners, L.P.* v. *Rockefeller Center Properties, Inc.*, 929 F. Supp. 294 (S.D.N.Y. 1996), the court reasoned:

> [I]t would be folly to hold, as plaintiff would have the Court do, that the knowing failure to disclose a material fact in and of itself necessarily gives rise to a strong inference of fraud. There are far too many circumstances in which a material omission would evidence no such mental state. The person or entity responsible might have held a perfectly reasonable and good faith, if ultimately mistaken, belief that the fact omitted was not material, to name but one.

*Id.* at 299.

Plaintiffs, however, contend that "[t]he *only* reasonable inference to be drawn from this intentional deception is that Harrison and Dimon knew that answering these questions honestly and completely would jeopardize their backroom deal." (Opp. at 8.) In fact, there is an obvious competing inference to be drawn (in addition to the competing inference of "a perfectly reasonable and good faith . . . belief that the fact omitted was not material"): *Mr. Harrison and Mr. Dimon were telling the truth*. This competing inference is especially compelling given that it is supported not only by the Joint Proxy Statement but also by plaintiffs' own complaint. (*See* Defs.' Mot. at 9–10.) Plaintiffs allege that "an independent investigation conducted by the *New*

7

*York Times* revealed that . . . [d]uring the negotiations with Mr. Dimon, [Harrison] fought hard to give himself the two extra years, *to secure a smooth transition*. . . ." (CAC ¶ 10 (emphasis added).) This is fully consistent with Mr. Dimon's statement that they had agreed to the two-year transition period because "these are two large organizations coming together" and "[y]ou want the teams to meld." No "reasonable person" who heard Mr. Harrison's and Mr. Dimon's statements "would deem the inference of scienter cogent and at least as compelling" as the non-culpable opposing inference, consistent with plaintiffs' own allegations, that Mr. Harrison and Mr. Dimon accurately described the considerations underlying the succession arrangement. *Tellabs*, 127 S. Ct. at 2510. As a result, plaintiffs' § 10(b) claim cannot survive *Tellabs*.[3]

### III.    Defendants' Motion is Timely.

Plaintiffs also oppose defendants' motion for reconsideration on the ground that the motion is untimely under Rule 59(e) and "fails to conform to any of the grounds specified in Rule 60(b)" (Opp. at 3). Defendants' motion was not filed pursuant to either of those rules. Neither Rule 59(e) nor Rule 60(b) applies to defendants' present motion because the Court's denial in part of their motion to dismiss was not a "judgment" pursuant to the former or a final order pursuant to the latter. *See, e.g.*, *Total Communication Services, Inc.* v. *Seiscor Technologies, Inc.*, No. 88-8312, 1991 U.S. Dist. LEXIS 5352, *3 n.3 (N.D. Ill. Apr. 19, 1991) ("We do not enter a judgment (final or otherwise) when we deny a motion to dismiss."). Rather,

---

[3]    Plaintiffs argue that the Court should not consider the *Tellabs*-based arguments in defendants' motion for reconsideration because during a hearing on plaintiff's Submission of Subsequent Authority (Dkt. 189), which brought the case to the Court's attention, defendants remarked that "the Court's consideration of the case by itself" *i.e.*, without further argument, "is sufficient." In accusing defendants of trying "to sneak in the backdoor all the additional arguments that they presented previously" (Opp. at 8), plaintiffs neglect to mention that the basis for defendants' motion for reconsideration is that the Court did *not* consider the case in evaluating whether plaintiffs' scienter arguments comported with the PSLRA's pleading standard.

it was an interlocutory order. In this jurisdiction, motions to reconsider interlocutory orders are "best . . . characterized as a common law motion for reconsideration." *Neal* v. *Honeywell*, No. 93-1143, 1996 WL 627616, *2 (N.D. Ill. Oct. 25, 1996); *see also United States* v. *Olsen*, No. 98-2170, 2001 U.S. Dist. LEXIS 10098, *6 (N.D. Ill. July 18, 2001) ("Courts in this jurisdiction have recognized common law motions for reconsideration of interlocutory orders."). The Court has the discretion to consider the motion and grant the relief sought.

## CONCLUSION

For the foregoing reasons and for the reasons set forth in their January 14, 2008 motion, defendants respectfully request the Court reconsider its December 18, 2007 Opinion denying in part defendants' motion to dismiss and to grant this motion in its entirety.

Respectfully submitted,

/s/ Kathleen L. Roach
  Kathleen L. Roach
  Courtney A. Rosen

OF COUNSEL:

Sharon L. Nelles
Suhana S. Han
Keith Levenberg
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-3712

*Counsel for Defendants*

Nancy E. Schwarzkopf
JPMORGAN CHASE LEGAL DEPARTMENT
1 Chase Manhattan Plaza, 26th Floor
New York, New York  10081
(212) 552-3585

*Counsel for Defendant J.P. Morgan Chase & Co.*

  Matthew B. Kilby
  Matthew R. Lyon
SIDLEY AUSTIN LLP
1 S. Dearborn
Chicago, Illinois  60603
(312) 853-7000

*Counsel for Defendants*

Julie A. Lepri
JPMORGAN CHASE LEGAL DEPARTMENT
10 S. Dearborn
Chicago, Illinois  60603
(312) 732-7354

*Counsel for Defendant J.P. Morgan Chase & Co.*

Date:  February 25, 2008