**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE JP MORGAN CHASE & CO. SECURITIES LITIGATION<br><br>This Document Relates to:<br><br>*Blau v. Harrison, et al.*, No. 04 C 6592<br><br>*Hyland v. Harrison, et al*. No. 06 C 4675<br><br>*Hyland v. J.P. Morgan Securities, Inc.,* No. 06 C 4676 | MDL No. 1783<br><br>Master Docket No. 06 C 4674<br><br>Judge David H. Coar<br><br>Magistrate Judge Martin C. Ashman |

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF FINAL APPROVAL OF SETTLEMENT**

Lead plaintiffs in *Blau v. Harrison* and in the consolidated *Hyland* actions respectfully request that the Court enter an Order and Final Judgment: (a) finding the notice to the class to be fully compliant with Fed. R. Civ. P. 23, due process, and any other applicable law; (b) finally certifying the settlement class under Fed. R. Civ. P. 23(a) and (b)(2); and (c) finally approving the global settlement of these actions (the "Settlement"), as embodied in the Stipulation of Settlement dated March 5, 2008 (the "Stipulation"), as fair, reasonable and adequate, and directing the parties to the Stipulation to consummate its terms.

**I.     INTRODUCTION**

The Settlement is the culmination of more than three years of hard fought litigation and arms-length negotiations. Each of the claims rests on the allegation that defendants failed to disclose in the proxy statement soliciting votes for the 2004 merger between JPMorgan Chase & Co. ("JPMC") and Bank One Corporation ("Bank One"), that William B. Harrison, the then-CEO of JPMC, rejected an offer from James Dimon, the then-CEO of Bank One, to structure the

deal as a zero-premium, stock-for-stock transaction if Mr. Dimon could assume the helm of the combined company upon consummation. Defendants consistently denied this allegation.

      Plaintiffs actively and aggressively prosecuted the actions, carefully analyzed the evidence developed during more than two years of discovery, the strength of defendants' legal defenses, and the unavailability of independent evidence corroborating the no-premium offer. As set forth more fully below, counsel for plaintiffs analyzed the law applicable to monetary and equitable relief in proxy cases and concluded not only that proof of liability in this matter appeared largely out of reach, but that proof of damages, even if liability could be established, would be extraordinarily difficult. In light of these considerations, and recognizing that any monetary settlement would likely be economically unfeasible,[1] plaintiffs agreed to settle their respective cases for adoption of carefully crafted and targeted governance reforms that offer significant protection and economic value to JPMC's shareholders in merger and acquisition situations like the one that gave rise to this litigation. The parties ultimately entered into the global Settlement, which confers substantial non-monetary benefits upon all of JPMC's stockholders in the form of corporate governance reforms specifically tailored to address the types of disclosure issues at the heart of these cases. These finely-tuned reforms – designed to ensure that stockholders will have the benefit of full and fair disclosures in proxy statements to enable them to cast informed votes on significant transactions, and that JPMC's board is kept adequately informed of material negotiations in order to exercise meaningful oversight – were crafted in consultation with corporate governance experts who have attested to their efficacy and value.

---

[1] The cost of noticing and administering a monetary settlement to holders of more than 2 billion outstanding JPMC shares would likely cost millions of dollars and perhaps consume most of the fund.

520756v5          2

Specifically, in the Settlement, JPMC has agreed that, for four years from adoption of the corporate governance reforms (the "Procedures"):

- the CEO of JPMC will inform JPMC's Presiding Director, appointed by JPMC's non-management directors, of discussions with any third party that expresses interest in a transaction that would require approval by JPMC's shareholders under Delaware law or the rules or regulations of any stock exchange on which JPMC has listed its stock;

- the Presiding Director and the CEO will review with the Board, or a committee thereof, the process for communicating with the Board, or a committee thereof, about the proposed transaction, including the method and frequency of communications;

- the Board will review any proxy statement issued in connection with a transaction requiring shareholder approval and will appoint a "Designated Committee" to help it in this process;

- the Designated Committee will review, with the assistance of management and financial and legal advisors, the "Background of the Merger" section of any such proxy statement, and will have the authority to recommend changes to the Board;

- in order to carry out the duties imposed by the Procedures, the Board and the Designated Committee will have the discretion to seek company paid assistance from outside consultants; and

- in the fourth year of the implementation of the Procedures, the Board's Corporate Governance and Nominating Committee, which is comprised of non-management directors, shall determine whether to recommend to the Board that the Procedures be continued. (Stipulation at ¶ 3.)[2]

Professor Jeffrey N. Gordon, the Alfred W. Bressler Professor of Law at Columbia Law School and Co-Director of the Columbia Center for Law and Economic Studies, who assisted plaintiffs' counsel in *Blau* in negotiating the principal terms of the Settlement, has opined that the Procedures constitute a "novel" and "creative" approach to assuring that shareholder interests are enhanced at times of significant corporate restructurings or acquisitions, and could well establish a "best practice" norm in corporate governance. Affidavit of Jeffrey N. Gordon

---

[2] The Stipulation is attached as Exhibit A to the accompanying Joint Motion for Final Approval of Class Action Settlement.

(Ex. A), ¶¶ 9, 16, 26. Professor Gordon further notes that "even small improvements in deal terms" resulting from the corporate governance reforms could "add tens of millions to shareholder value" to the shareholders of JPMC. Ex. A, ¶ 24.

Professor James L. Bicksler, Professor of Financial Economics at Rutgers University Graduate School of Management, another expert retained by plaintiffs' counsel in *Blau*, has further opined, on the basis of empirical studies, that governance reforms that promote meaningful oversight of management by independent board members, such as those in the Settlement, generally result in improved stock performance of up to 8.5%. *See* Affidavit of James L. Bicskler (Ex. B), at ¶¶ 10, 22. Based on JPMC's current market capitalization of approximately $130 billion, even a 1 percent positive incremental effect on JPMC's equity as a result of the Procedures would be $1.3 billion per year.[3] *Id.*, ¶ 14.

This value-enhancing corporate governance program accomplishes the goal of enforcing the proxy disclosure rights asserted by plaintiffs and the class, and is precisely the type of equitable-type relief envisioned in *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970), the seminal case on stockholders' rights in a merger proxy solicitation, in which the Supreme Court held that "the importance of fair and informed corporate suffrage leads to the conclusion that . . . private stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to *all* shareholders by providing an important means of enforcement of the proxy statute." 396 U.S. at 391-92 (emphasis added). Accordingly, all parties request that the Court finally certify the class under Fed. R. Civ. P. 23(a) and 23(b)(2) and grant final approval to the Settlement.

---

[3] Professor Bicksler also opines that, in potential deals involving possible acquisition targets of JPMC, the Procedures could result in increased value of anywhere between $600 million and $4.4 billion. *Id.*, ¶¶ 42-43.

## II.    RELEVANT BACKGROUND

The *Blau* and the first of the *Hyland* actions were filed on October 13, 2004 and March 17, 2005, respectively. These, and the other actions arising from the JPMC/Bank One merger,[4] were initiated after a June 27, 2004 article in the New York Times entitled "The Yin, the Yang and the Deal," which citing "two people close to the deal," reported on the alleged no-premium offer.[5] Beginning with Judge Hibbler's March 26, 2006 upholding of the Section 14(a) claim in *Blau*, two years of intensive discovery ensued. Blau's counsel propounded numerous document requests and interrogatories, subpoenaed third parties (including the financial and legal advisors to JPMC and Bank One on the merger, the New York Times, The Financial Times and The Wall Street Journal), and litigated numerous discovery motions. Plaintiffs carefully reviewed more than 63,600 documents (constituting over 445,800 pages) secured from defendants and third parties, and took the depositions of multiple current and former executives of JPMC. Ultimately, discovery yielded no hard evidence which independently corroborates the New York Times report of Mr. Dimon's alleged offer:

- The merger-related documents produced by defendants uniformly showed that, during the merger negotiations, Mr. Dimon always wanted a premium, while Mr. Harrison always resisted paying a premium until the final stages of the negotiations when Mr. Harrison agreed to pay a premium that approximated an at-market price. The documents also showed that there was agreement on succession issues prior to the final negotiations on pricing.

---

[4] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766 (Del. 2006) (upholding Chancery Court's dismissal); *Shaper v. Bryan*, 371 Ill. App. 3d 1079, 1088-89, 864 N.E.2d 876, 885 (2007) (dismissal of case against Bank One's directors on the pleadings).

[5] Other news articles similarly reported on the merger negotiations. For example, a July 3, 2004 article in The Financial Times (London) referenced the New York Times article, and cited an unnamed source, an "advisor," who reportedly said "there was a spectrum of outcomes in terms of premium and governance." A December 29, 2004 article in The Wall Street Journal, relying on an unnamed "person familiar with the talks," reported that "Dimon had suggested selling his bank for billions less if, among other conditions, he immediately became chief of the merged firm."

- In its interrogatory responses, JPMC flatly denied the existence of the offer, stating that "[a]t no time did Mr. Dimon make an offer to proceed with the merger for no premium or a lower premium to Bank One shareholders in exchange for Mr. Dimon becoming CEO or Chairman of the merged company immediately." Ex. C at 3. The director defendants similarly denied knowledge of any such offer.[6]

- Later, as part of confirmatory discovery obtained by plaintiffs as a condition of the Stipulation, Messrs. Dimon and Harrison – who had at least five private meetings during the merger negotiations, and who are the only individuals who have personal knowledge of what was said at those negotiations – both testified under oath that no such offer was made during the merger negotiations.[7]

- Plaintiff also deposed four other current and former executives of JPMC all of whom expressly denied knowledge of any such offer.

    o Two senior executives from JPMC's media relations department, who had the most contact with Landon Thomas, the author of the New York Times article, and who arranged and/or attended Mr. Thomas' interviews with Messrs. Dimon and Harrison, both referred to the report of the offer as an unsubstantiated rumor, and further testified that, Mr. Harrison, when asked before the article was published whether Mr. Dimon had made the offer, vehemently denied it. One of these executives also testified that she asked Mr. Thomas not to include the anonymously-sourced report in his story, but that the New York Times published it anyway.

    o Plaintiffs also deposed two individuals who were quoted and/or referenced in the article: Walter Shipley, the former CEO of JPMC, who was Mr. Harrison's close confidante and who consulted on the merger; and Steven Black, one of the two co-CEO's of J.P. Morgan Securities who was also a longtime close friend of Mr. Dimon. They both denied knowledge of the offer.

Plaintiffs were also unable to uncover the identities of the unnamed sources cited in the New York Times and other articles. Dr. Blau's counsel subpoenaed the journalists, but each

---

[6] Defendants' interrogatory responses related the following plausible conversation between Messrs. Dimon and Harrison about the New York Times article: "Mr. Dimon recalls responding [to Mr. Harrison] that Mr. Thomas appeared to have misconstrued Mr. Dimon's negotiating position that the zero-premium deal Mr. Harrison was proposing did not resemble a merger of equals." Ex. C, at 4.

[7] The deposition transcripts have been designated confidential by defendants, and are not included as exhibits. Plaintiffs stand ready to provide them as the Court may direct.

newspaper, located in New York, refused to divulge the identities of the confidential sources, and research by counsel confirmed that it would be nearly impossible to get a court to order them to do so.[8]  Plaintiffs' counsel had personal conversations with Mr. Thomas on several occasions but the identity of the two alleged sources was never disclosed.

After extensive legal and factual research, including Dr. Blau's counsel's consultation with an independent expert, it also became clear that, even if plaintiffs were able to uncover evidence of an offer, the likelihood of establishing that it was material or of recovering substantial damages was remote under Seventh Circuit law.  Defendants assert that even if Mr. Dimon had made the alleged statement, it was not a viable offer, and the board of directors and the shareholders of JPMC and Bank One, respectively, would not have approved a transaction with Mr. Dimon as the immediate CEO and with no premium.  Plaintiffs, who have the burden of proving materiality, have uncovered no evidence to the contrary.

In the Seventh Circuit, the measure of damages in a Section 14(a) case is based on the economic fairness of a merger measured by the pre-merger market value of the merger parties (and a proportionate share of post-merger synergies).  *Mills v. Elec. Auto-Lite Co.*, 552 F.2d 1239, 1248 (7th Cir. 1977).  Here, it would be difficult for an expert to credibly argue that the 14% premium, based on a 1.32 exchange ratio in favor of Bank One, is unfair, particularly as comparable mergers between large financial institutions were done at far higher premiums, most notably, the Bank of America and Fleet Boston merger, which had a premium of 40% in favor of Fleet Boston.  Moreover, JPMC's stock price did not drop significantly in the wake of the Merger announcement, even though the stock price of an acquirer frequently falls after a stock-

---

[8] The standard for defeating journalist privilege in civil cases is extremely high under New York law. *See, e.g., In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 9 (2d Cir. 1982); *Persky v. Yeshiva Univ.*, 01 Civ. 5278 (LMM), 2002 U.S. Dist. LEXIS 23740 (S.D.N.Y. Dec. 9, 2002).

for-stock acquisition is announced. Different damages models that are used in other jurisdictions, but have not been adopted in the Seventh Circuit, are similarly difficult to apply to this case.[9]

### A. The December 2007 Settlement

Against this backdrop, and after defendants rebuffed plaintiffs' counsel's various efforts to negotiate a monetary settlement, in the summer of 2007, counsel in *Blau* began to investigate the possibility of a corporate therapeutics settlement. Blau's counsel retained Professor Gordon, who assessed the reforms under discussion and concluded that the reforms would provide a substantial benefit to the class. Professor Gordon made suggestions to counsel to sharpen the governance reforms. He opined that the reforms serve the laudable goal of enhancing shareholder welfare, particularly in acquisition scenarios where the shareholders of the acquiring company generally fare worse, because the Board's early participation in the negotiations may result in a better price and the shaping of a better management team. Ex. A, ¶ 16. He further opined that the prospect that the Designated Committee will review proxy statements will spur increased management accountability in negotiations, and that the board review of disclosures will increase public confidence in the accuracy of proxy statements, and reduce the company's exposure to potential litigation. Ex. A, ¶ 16. Professor Gordon also noted that the Board's

---

[9] Out-of-pocket losses cannot be calculated here, because the alleged omission or misrepresentation did not affect the price of JPMC shares. *See Goldkrantz v. Griffin*, No. 97 CIV. 9075 (DLC), 1999 WL 191540, at *7 (S.D.N.Y. Apr. 6, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999). Benefit of the bargain damage analysis applies only where misrepresentations are made in proxy statements as to the consideration of an intended merger, which is not the case here. *See Osofsky v. Zipf*, 645 F.2d 107, 114 (2d Cir. 1981). It would also be extremely difficult to establish lost opportunity damages, because plaintiff would have had to demonstrate that had the "lost opportunity" been disclosed, the merger would have been defeated <u>and</u> then that a no-premium offer, with Dimon as CEO, would have materialized <u>and</u> been accepted by JPMC's board <u>and</u> approved by both sets of shareholders. *See In re DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616 (D. Del. 2003); *see also Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 213 (3d Cir. 2002) ("plaintiffs may rely on a 'lost opportunity' theory only where the fact of loss is not wholly speculative"). After conducting extensive discovery, plaintiffs have uncovered no evidence that would weigh toward meeting this or any other requirements of establishing lost opportunity damages.

responsibility in overseeing the accuracy of the proxy will result in greater Board oversight of the transaction itself as negotiations continue. Ex. A, ¶ 16. Armed with this expert advice, on December 7, 2007, Blau's counsel entered into a Stipulation of Settlement under which JPMC agreed to adopt the corporate governance reforms set forth herein, and notified the Court of that settlement on December 14, 2007. Defendants subsequently notified Blau's counsel that the parties in *Hyland* wished to participate in a mediation in contemplation of a potential settlement, and Blau agreed that the parties' December 14, 2007 joint motion for a scheduling order for the preliminary approval of the December 2007 settlement could be withdrawn pending the outcome of the mediation.

    B.    **The March 2008 Global Settlement**

Following the Court's December 18, 2007 ruling on defendants' motion to dismiss and the propounding of additional discovery in *Hyland*, the parties in *Hyland* conducted a full-day mediation session before the Hon. Nicholas H. Politan (D.N.J.)(Ret.). The parties in *Hyland* reached an agreement to settle that case on terms substantially the same as the *Blau* settlement with two modifications: (i) the settlement would be conditioned upon confirmatory discovery – including the depositions of Messrs. Dimon and Harrison; and (ii) the removal of a clause concerning the ability of the Board and/or the Designated Committee to modify the methods by which they would fulfill their duty under the Procedures. After consultation between plaintiffs' counsel in *Blau* and *Hyland*, the parties agreed to enter into a global Settlement. After the depositions of Messrs. Dimon and Harrison failed to yield any evidence which supported the allegation of a material no-premium offer, the parties moved for preliminary approval of the Settlement on June 23, 2008. This Court granted preliminary approval of the Settlement on July 8, 2008.

### III.   ARGUMENT

#### A.   The Proposed Settlement Should Be Approved as Fair and Reasonable

The corporate governance reforms in the Settlement provide precisely the kind of relief contemplated by Section 14(a) because they address the types of disclosure issues underlying these cases and seek to foster accurate disclosures in JPMC's future proxy statements as well as appropriate oversight by the board of directors. The Supreme Court in *Mills* emphasized the importance of corporate therapeutics in remedying violations of the federal proxy laws, and specifically noted:

> In many suits under § 14(a), particularly where the violation does not relate to the terms of the transaction for which proxies are solicited, it may be impossible to assign monetary value to the benefit. Nevertheless, the stress placed by Congress on the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners [by establishing a proxy violation] have rendered a substantial service to the corporation and its shareholders.

396 U.S. at 396. The Court found the vindication of proxy rights so important that it ruled that petitioners were entitled to attorneys' fees and expenses *solely* for establishing the existence of the proxy violation – *before* plaintiffs had secured *any* monetary or equitable relief for the class.[10]

Countless other courts similarly have recognized that non-monetary benefits, such as material changes in corporate governance, provide substantial benefits to corporations and their shareholders. *See*, *e.g.*, *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993) (upholding settlement agreement mandating structural changes in Bell Atlantic's corporate governance); *Zimmerman v. Bell*, 800 F.2d 386, 391 (4th Cir. 1986) (nonmonetary settlement relief adequate

---

[10] On remand, the District Court found that the merger terms were unfair to the minority shareholders and awarded approximately $1.3 million in damages to plaintiff and the class; however, the Seventh Circuit reversed and, ultimately, plaintiffs recovered no damages for the class. *Mills*, 552 F.2d at 1249.

when it provided guidelines for "future management responses to tender offers and takeover bids"); *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1207 (6th Cir. 1992) (corporation received release from potential liability to settling plaintiff shareholder and settlement called for changes in corporate governance aimed at limiting corporation's disbursements to settling defendant director and controlling shareholder); *Maher v. Zapata Corp.*, 714 F.2d 436, 466 (5th Cir. 1983) (nonmonetary relief adequate settlement relief); *Unite Nat'l Ret. Fund v. Watts*, Civ. A. No. 04-CV-3603 (DMC), 2005 U.S. Dist. LEXIS 26246, at *9-10 (D.N.J. Oct. 27, 2005). To qualify as substantial, a non-monetary benefit must be "one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest." *Mills*, 396 U.S. at 396. As noted in the expert affidavits of Professors Gordon and Bicksler, those are the very hallmarks of this Settlement, where the novel corporate procedures providing for early board involvement target and seek to deter the very conduct that underlies plaintiffs' Section 14(a) claim. This Settlement clearly meets the "substantial benefit" standard in *Mills* and its progeny.[11]

While settlements comprised solely of corporate governance reforms generally occur in derivative cases, because Section 14(a) itself provides for purely non-monetary relief to enforce shareholder proxy rights,[12] and the class consists only of holders of JPMC stock on April 2,

---

[11] *See, e.g., Watts*, 2005 U.S. Dist. LEXIS 26246, at *18 ("the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement … will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings."); *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302 (SWK), 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006) (approving governance and compliance settlement because it addressed the failure of internal controls and observing that the "preventative aspect of these provisions is itself a significant benefit of the Settlement").

[12] As the Supreme Court held in *Mills*, possible forms of relief in a Section 14(a) case include "setting aside the merger or granting *other equitable relief.*" *Mills*, 396 U.S. at 386 (emphasis added).

2004, the direct Section 14(a) claim closely resembles a derivative claim. Indeed, the Court provisionally certified the settlement class as a Rule 23(b)(2) class, which applies to cases in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). As in derivative actions, the relief here applies generally to all of JPMC's shareholders. Thus, the equitable relief of the corporate governance reforms under the Settlement is similar to the relief routinely approved in derivative action settlements.

In any event, settlements providing solely non-monetary relief have also been approved as providing a substantial benefit in numerous class actions. In *Mencher v. Sachs*, 164 A.2d 320 (Del. 1960), a class action, the Delaware Supreme Court approved a settlement that provided for cancellation of illegally issued stock, ruling that "[c]ancellation of illegally issued stock is in itself a benefit. Although the benefit may be difficult of evaluation in dollars and cents, it is still a benefit." *Id*. at 323. *See also Arnold v. Arizona Dep't of Public Safety*, No. CV-01-1463-PHX-LOA, 2006 WL 2168637 (D. Ariz. July 31, 2006) (approving settlement of case alleging racial profiling which provided purely injunctive relief which was designed to deter this illegal practice from occurring in the future).

Moreover, it is not necessary for corporate governance or other non-economic settlements in class actions to benefit *all* members of the class in order to be approved.[13] For example, in *In re Triarc Cos., Inc. Class & Derivative Litigation,* 791 A.2d 872 (Del. Ch. 2001), the Delaware Supreme Court approved a settlement for equitable relief in a class and derivative case, noting that "[w]here the claim is of such a nature that the only available relief is either equitable or directed to the benefit of the corporation, it is unavoidable that persons who sever their economic

---

[13] Because 67% of the one-day class consists of institutional shareholders, many of which continue to hold their shares, even non-institutional investors generally employ a buy and hold strategy when investing in large financial institutions like JPMC.

relationship with the corporation during the litigation will not benefit from a settlement or a judgment in favor of the class." *Id.* at 879. *See also First State Orthopaedics v. Concentra, Inc.*, Civ. A. No. 05-4951, 2007 U.S. Dist. LEXIS 77557 (E.D. Pa. Oct. 16, 2007) (approving settlement that only benefited some though not all class members because it consisted solely of prospective reforms to the way defendant company performed its business). In sum, a governance settlement "has extensive qualitative benefit [and] [s]hareholders therefore necessarily … benefit as a result indirectly. Frankly, their corporation is going to be a better corporation because of it." *US West, Inc. v. MacAllister*, No. 92-B-1254, 1992 WL 427772, at *12 (D. Colo. Dec. 18, 1992).[14]

### B. The Relevant Factors for Assessing Fairness Militate in Favor of Approving the Settlement

In assessing the fairness, reasonableness and adequacy of a class action settlement, courts balance a number of factors, which all favor approval of the Settlement. *See Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 308 (7th Cir. 1985).[15] The first factor – comparing the viability of plaintiffs' claims against the benefits of the settlement – is the most important, *Armstrong v. Board of School Directors*, 616 F.2d 305, 314 (7th Cir. 1980), and weighs heavily in favor of approving the Settlement as in the best interests of the class. As set forth above, even after exhaustive discovery, including depositions of JPMC's CEO and ex-CEO, the likelihood of

---

[14] This is the same principle followed in discrimination cases, where courts routinely approve settlements providing for non-economic remedial measures – such as voluntary bans on employing discriminatory practices – even though some members of the class, such as individuals who were former victims of such discrimination, may not derive any benefit. *See*, *e.g.*, *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 295 (W.D. Tex. 2007) ("Every class member will have the assurance that, should he or she renew or reapply for insurance through Allstate, he or she will have the benefit of his or her premiums being based on a non-discriminatory credit scoring formula….").

[15] "The factors which a district judge should consider are well established: the strength of the plaintiff's case on the merits measured against the terms of the settlement; the complexity, length, and expense of continued litigation; the degree of opposition to the settlement; the presence of collusion in gaining a settlement; the opinion of competent counsel as to the reasonableness of the settlement; and the stage of the proceedings and the amount of discovery completed." *Id.*

plaintiffs establishing liability is low at best. The problem of damages, in particular, is nearly insurmountable. First, it is unclear whether a "lost opportunity" theory of damages would be upheld by the Seventh Circuit and the Supreme Court. Second, assuming the viability of such a damages theory, the chain of causation necessary to prove the "lost opportunity" would have required the sort of speculative hypotheticals that have undermined such theories in other securities class actions. *See Tse*, 297 F.3d at 221 (affirming summary judgment in favor of defendants and noting there were "at least four events upon which the plaintiffs' alleged lost opportunity would hinge"). It is far from certain that the merger would have been voted down by JPMC shareholders even if a definitive no-premium offer had been disclosed; it is even less certain that a no-premium offer would have been put back on the table if the merger had been voted down; and, finally, it is unlikely that both Bank One's board and its shareholders would have approved a no-premium deal. In short, the likelihood of recovering on the merits is extraordinary low.[16]

In addition, the extraordinarily contentious nature of this four-year old case is a sure indication that further proceedings, which may include an appeal from the Court's ruling on Blau's pending class certification motion, a ruling on defendants' still-pending motion for

---

[16] The obstacles to recovery set forth above are common to both the Section 14(a) claims and the Section 10(b) claims. The factual and legal obstacles to prevailing on the merits on the Section 10(b) claims exceed those facing the Section 14(a) claims. Defendants raised and continue to assert defenses emphasizing the reliance and stringent scienter elements necessary to proving Section 10(b) claims. As to reliance, the fraud-on-the-market presumption of reliance is, of course, merely a presumption, and thus rebuttable. *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988). In this case, defendants would contend that the market price of JPMC's shares was not influenced by the non-disclosure; and, in the alternative, that investors would have sold their shares at the same price notwithstanding the non-disclosure. The lack of a statistically significant price movement also bolsters defendants' attack on the loss causation element, which is already highly uncertain due to the absence of guidance on "lost profits" damages theories in the wake of *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). As to scienter, the shifting legal landscape, including the Supreme Court's *Tellabs* decision, introduces additional uncertainty, rendering the Section 10(b) claims far more tenuous than the Section 14(a) claims in this litigation.

reconsideration in the *Hyland* actions, and certainly additional discovery and summary judgment motion practice, will be protracted and costly, and a drain on judicial resources. Both the December 2007 settlement in *Blau* and the March 2008 global Settlement were negotiated in good faith and at arms' length, indicating the absence of any collusion. Further, it is the unanimous opinion of all plaintiffs' counsel, who specialize in complex securities class actions, that the Settlement is in the best interests of the class. Finally, there has not been a single objection to the Settlement since notice of the Settlement was published on July 11, 2008, over two months ago.

## IV.　CONCLUSION

The detailed corporate governance reforms in the proposed Settlement help place JPMC at the forefront of corporate governance and set a new standard for blue-chip corporations. The Settlement is a superior result and provides a substantial benefit to JPMC and its shareholders. Plaintiffs respectfully request that the Court find the proposed Settlement to be fair, reasonable and adequate and approve the Settlement in its entirety.[17]

---

[17] Plaintiffs also submit that the Court should (a) find the notice to the class to be fully compliant with Fed. R. Civ. P. 23, due process, and any other applicable law; and (b) finally certify the settlement class under Fed. R. Civ. P. 23(a) and (b)(2), for the reasons set forth in the Preliminary Approval Order.

DATED:  September 16, 2008				Respectfully submitted,

**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLC**


/s/  Adam J. Levitt
Adam J. Levitt
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Tel:  (312) 984-0000
Fax:  (312) 984-0001
email:  levitt@whafh.com

**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
Jeffrey G. Smith
Demet Basar
Rachel S. Poplock
270 Madison Avenue
New York, New York 10016
Tel: (212) 545-4600
Fax: (212) 545-4653
email:  basar@whafh.com

*Lead Counsel for Plaintiff
in Blau v. Harrison*


/s/  Joseph N. Gielata
**JOSEPH N. GIELATA
ATTORNEY AT LAW**
501 Silverside Road, No. 90
Wilmington, Delaware 19809
Tel: (302) 798-1096

*Lead Counsel for Plaintiffs in
Hyland v. Harrison and
Hyland v. J.P. Morgan Securities, Inc.*