**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE JPMORGAN CHASE & CO. SECURITIES LITIGATION | ) ) ) |
| **This document relates to** | ) **MDL No. 1783** ) ) **Master Docket No. 06 C 4674** |
| *Blau v. Harrison,* et al., No. 04 C 6592 | ) ) **HONORABLE DAVID H. COAR** |
| *Hyland v. Harrison,* et al., No. 06 C 4675 | ) ) |
| *Hyland v. J.P. Morgan Securities, Inc.*, No. 06 C 4676 | ) ) ) ) ) |

## MEMORANDUM OPINION AND ORDER

This is a multi-district litigation consisting of three cases: *Blau, et al. v. Harrison*, *et al.*, No. 04 C 6592 (or "Blau"); *Hyland v. Harrison et al.*, No. 06 C 4675 (or "Hyland I"); and *Hyland v. J.P. Morgan Securities Inc*., No. 06 C 4674 (or "Hyland II"). The lead plaintiffs of each case have joined in a motion to approve the parties' global settlement (the "Settlement"), and intervenor Patrick Sherlock has filed his objections. For the following reasons, the motion to approve the settlement is DENIED.

### I. BACKGROUND

The Blau, Hyland I, and Hyland II complaints are premised on an allegation that the defendants failed to disclose in the proxy statement soliciting votes for the 2004 merger between JPMorgan Chase & Co. ("JPMC") and Bank One Corporation ("Bank One"), that William Harrison, the then-CEO of JPMC, rejected an offer from James Dimon, the then-CEO of Bank

One, to structure the deal as a zero-premium, stock-for-stock transaction, with Dimon as CEO of the combined company upon consummation. That purported offer had been reported in a June 27, 2004 article in The New York Times entitled "The Yin, the Yang and the Deal," which cited as sources "two people close to the deal"; articles in The Financial Times and The Wall Street Journal reported similar accounts. In their complaint, the plaintiffs alleged that Harrison had rejected the offer and agreed instead to a deal with a 14% premium (worth approximately $7 billion) so that he could retain his position as CEO for two years.

Despite two years of discovery, including reviewing more than 445,800 pages of documents, issuing interrogatories, deposing multiple current and former JPMC executives, and subpoenaing numerous third parties, the lead plaintiffs' attorneys represent that they have not found evidence to corroborate independently the newspapers' accounts. Rather, the merger-related documents produced by defendants show that (1) Dimon sought a premium throughout the merger negotiations; (2) Harrison resisted paying a premium until the final stages of the negotiations; and (3) the two had reached an agreement on succession issues before their final negotiations on pricing.

That account is consistent with JPMC's response to an interrogatory that "[a]t no time did Dimon make an offer to proceed with the merger for no premium or a lower premium to Bank One shareholders in exchange for Dimon becoming CEO or Chairman of the merged company immediately." The director defendants, too, deny knowledge of any similar offer. As do four JPMC executives, including two senior executives from its media relations department who had the most contact with Landon Thomas, the author of the New York Times article, and who had

arranged and/or attended Thomas's interviews with Dimon and Harrison. Walter Shipley, the former CEO of JPMC, whom Harrison had consulted about the merger, and Steven Black, one of two co-CEOs of J.P. Morgan Securities and a longtime close friend of Dimon, also denied knowledge of the offer.

Failing independently to uncover anyone with knowledge of the alleged offer, the plaintiffs attempted to obtain the names of the sources cited in the publications that had reported the offer. Although Blau's counsel subpoenaed the journalists, each newspaper refused to name their sources, and Thomas himself has not volunteered the names. The plaintiffs say it would be "nearly impossible" to override the journalists' assertions of privilege in court.

The lack of a "smoking gun" is not the plaintiffs' only trouble. They note that, even if the alleged offer was made, they would have the burden of showing that it was material. On this score, they've found no evidence to contradict the defendants' assertion that, even if Dimon had made the alleged proposal, it was not a viable offer. They say that no evidence suggests that the board of directors and the shareholders of JPMC and Bank One, respectively, would have approved a no-premium merger with Dimon as the immediate CEO.

The steepest hurdle, according to the plaintiffs, is proving damages. They argue that the Seventh Circuit's method for calculating damages in a Section 14(a) case would not offer them much relief. They posit that damages would be awarded only if the merger was unfair, s*ee Mills v. Elec. Auto-Lite Co.*, 552 F.2d 1239, 1247-48 (7th Cir. 1977), and they note that far higher premiums have been tendered in comparable mergers between large financial institutions, including Bank of America's payment of a 40% premium in favor of Fleet Boston when they merged. They add that JPMC's stock price did not drop significantly in the wake of the merger

announcement, even though the stock price of an acquirer frequently falls after a stock-for-stock acquisition is announced.

As a result of these weaknesses, the plaintiffs attempted first to negotiate with defendants a monetary settlement. Defendants refused, so the Blau plaintiffs next considered a "corporate therapeutics" settlement. Blau's counsel retained Professor Jeffrey N. Gordon, the Alfred W. Bressler Professor of Law at Columbia Law School and Co-Director of the Columbia Center for Law and Economic Studies, who collaborated with counsel in drafting terms for a corporate therapeutics settlement.

JPMC was willing to agree to the proposed reforms, and so on December 7, 2007, Blau's counsel entered into a Stipulation of Settlement. The parties held off on seeking court approval of the settlement while the parties in Hyland I & II participated in mediation before Judge Nicholas H. Politan (D.N.J.)(Ret.). That mediation led to an agreement to settle the Hyland cases on terms substantially the same as the Blau settlement, with two modifications: (1) the settlement would be conditioned upon confirmatory discovery—including deposing Dimon and Harrison; and (2) a clause concerning the ability of the Board and/or the Designated Committee to modify the methods by which they would fulfill their duties was removed. The parties then agreed to enter into a global settlement that incorporated these changes.

After undergoing confirmatory discovery, the lead plaintiffs represent that the depositions of Dimon and Harrison failed to yield any evidence to support the allegation of a material no-premium offer. Specifically, Dimon and Harrison—who had at least five private meetings during the merger negotiations, and who alone have personal knowledge of the content of those negotiations—both testified under oath that the alleged offer was not made.

Accordingly, the parties moved for preliminary approval of the Settlement, which this court granted on July 8, 2008.

In the Settlement, JPMC agrees that it will adopt the following corporate governance reforms, which will remain in effect for four years:

- the CEO of JPMC will inform JPMC's Presiding Director, appointed by JPMC's non-management directors, of discussions with any third party who expresses interest in a transaction that would require approval by JPMC's shareholders under Delaware law or the rules or regulations of any stock exchange on which JPMC has listed its stock;

- the Presiding Director and the CEO will review with the Board, or a committee thereof, the process for communicating with the Board, or a committee thereof, about the proposed transaction, including the method and frequency of communications;

- the Board will review any proxy statement issued in connection with a transaction requiring shareholder approval and will appoint a "Designated Committee" to help it in this process;

- the Designated Committee will review, with the assistance of management and financial and legal advisors, the "Background of the Merger" section of any such proxy statement, and will have the authority to recommend changes to the Board;

- in order to carry out the duties imposed by the reforms, the Board and the Designated Committee will have the discretion to seek paid assistance from outside consultants; and

- in the fourth year of the implementation of the reforms, the Board's Corporate Governance and Nominating Committee, which is comprised of non-management directors, shall determine whether to recommend to the Board that the reforms be continued.

The Stipulation further provides that any of these procedures may be altered or terminated if the Board, upon advice of counsel, determines that (a) the procedures conflict with any law, regulation or rule to which JPMC is subject; (b) a different corporate governance measure

adopted by the Board would more appropriately effect the goals of the reforms; or (c) JPMC merges into another company and is not the surviving entity of such merger.

On October 1, 2008, Patrick Sherlock filed various objections to the proposed settlement. This court granted Sherlock's motion to intervene on October 15, 2008. Sherlock's objections are that (1) the Settlement provides the Board with unrestrained discretion to change or discontinue the corporate governance procedures within the first four years; (2) the benefits of the Settlement expire after four years; (3) class members who are no longer shareholders receive no benefit from the Settlement; and (4) the release of all claims known and unknown is overly broad and lacks consideration. (R.314, Tr. 12/30/08 Hr'g at 6; R.276, Sherlock Objections at 1-5; R.301, Sherlock Supplemental Memo. at 2-5.)

On December 30, 2008, this court conducted a fairness hearing, which the parties and Sherlock attended.

## II. LEGAL STANDARD

This court must "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279 (7th Cir. 2002). And it may approve a class-action settlement only if it is "fair, adequate, and reasonable, and not a product of collusion." *Id.*; Fed. R. Civ. P. 23(e)(1)(C). In assessing the fairness, reasonableness and adequacy of a settlement, the court must consider (1) the strength of the plaintiffs' case compared to the benefits of settlement; (2) the likely complexity, length and expense of continued litigation; (3) the extent of opposition to settlement among affected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed at the time of settlement. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,

463 F.3d 646, 653 (7th Cir. 2006) (citations and quotation marks omitted).  Of these considerations, the first is most important.  *Id.*

### III. ANALYSIS

A.  Strength of Plaintiffs' Case

In considering the strength of the plaintiffs' case, "the district court should begin by quantifying the net expected value of continued litigation to the class.  To do so, the court should estimate the range of possible outcomes and ascribe a probability to each point on the range." *Synfuel Techs.*, 463 F.3d at 653 (quotation marks and citation omitted).  Although "a high degree of precision cannot be expected in valuing a litigation, the court should nevertheless insist that the parties present evidence that would enable possible outcomes to be estimated, so that the court can at least come up with a ballpark valuation."  *Id.* (quotation marks and citation omitted).

Here, the court cannot ascertain the value of the plaintiffs' claims because they have neither identified possible outcomes nor quantified potential recoveries.  Indeed, the $7 billion figure cited in their complaint—representing the approximate value of the 14% premium—goes unmentioned in their motion for settlement, even though it presumably represents their recovery under a best-case scenario.  Instead, the plaintiffs have focused entirely on the improbability of success on the merits.  But even if the plaintiffs' overall probability of success is close to zero, there are quite a few zeros in $7 billion; applying rough calculations, a 0.5 % chance of recovery still could be worth $35 million.  In short, this court cannot assess the value of the plaintiffs' claims based only on the likelihood of their success.

As guidance, the court can conceive of three potential outcomes, the values of which would be useful for its analysis:  a best-case scenario (which would involve findings that (1) the

offer was made; (2) had shareholders known about it, the merger would not have been approved; and (3) the no-premium merger would have been approved), a second-best scenario (finding (1) and (2) but not (3)); and a worst-case scenario (finding only (1), or none at all). The plaintiffs, of course, can present additional or different scenarios—but the court must have some ballpark figures to conduct this analysis. *See Synfuel Techs.*, 463 F.3d at 653.

This is not the only gap in the plaintiffs' assessment of the strength of their case. Although the court generally agrees with the plaintiffs that their overall probability of success is quite low, the court is somewhat skeptical of some of the plaintiffs' analysis. First, the court doubts that overriding the journalists' privilege will be "nearly impossible," as the plaintiffs claim. Reviewing only the cases the plaintiffs cited, the standard identified in those cases is indeed strict, but it would be helpful for the court if the plaintiffs explained why they believe they cannot meet it. *See In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982) (requiring "clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources"); *Persky v. Yeshiva Univ.,* No. 01 Civ. 5278, 2002 U.S. Dist. LEXIS 23740 (S.D.N.Y. Dec. 10, 2002) (same).

Second, the plaintiffs apparently have concluded that the alleged offer's materiality depends entirely on its viability. The test for materiality, however, is whether the information would have been considered significant to a reasonable investor considering the merger. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). Could the offer be "significant" even if it is non-viable? Would the investors have known that the offer was non-viable? Although the court may very well agree with the plaintiffs

that viability is dispositive, it would be easier to assess that conclusion if the plaintiffs hued their analysis to the relevant legal standard.

Additionally, while the court does not doubt the plaintiffs' claim that they found no evidence that the boards or shareholders would have approved a no-premium merger, it would be easier to assess if the plaintiffs provided some detail about the inquiry they conducted. It would have been helpful, for example, if the plaintiffs had highlighted the evidence that suggests non-viability—e.g., former Bank One directors' testimony that they would not have approved a no-premium merger, or JPMC directors' testimony that they highly valued a smooth succession. The court must be able to evaluate independently the plaintiffs' assertions; it cannot simply be a "rubber stamp." *See Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 314-15 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998).

Third, the plaintiffs must consider more carefully the related issues of loss causation and damages. The former refers to whether the plaintiffs would have been better off had the defendants disclosed the offer. *See generally Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343-45 (2005); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 686 (7th Cir. 1990). Under the best-case scenario noted above, that would involve showing that (1) the shareholders would have voted down the merger, (2) the no-premium offer would have been placed back on the table, and (3) a no-premium merger would have been approved. If there is any chance that the plaintiffs could establish these facts, they could use a lost-chance theory to calculate damages. *See Doll v. Brown*, 75 F.3d 1200, 1205-06 (7th Cir. 1996) (suggesting viability of lost-chance theory where injuries are "inescapably probabilistic."). The plaintiffs dismiss this model because, they say, their loss is too speculative. *See Tse v. Ventana Med. Sys.*, 297 F.3d 210, 221 (3d Cir. 2002).

But, as noted above, the court cannot rely on that assessment absent a showing that their inquiry was thorough.

Meanwhile, if the plaintiffs could show only that the merger would have been voted down, their damages would likely be based on the unfairness of the merger. The plaintiffs identified this possibility, citing the Seventh Circuit's method for that assessment—which would involve comparing a JPMC common-stock holder's share of the pre-merger market value of JPMC (plus a proportional share of the increased market value of the combination) with the stockholder's share of the market value of the combination, *see Mills v. Elec. Auto-Lite Co.*, 552 F.2d 1239, 1247-48 (7th Cir. 1977)—but they did not attempt to apply it. Instead, the plaintiffs simply asserted that it would be hard to contest the fairness of a 14% premium based on a 1.32 exchange ratio in favor of Bank One. If the plaintiffs re-attempt approval of a settlement, they should use the models they cite to explain why their expected recovery is low.

### B. Benefits of Settlement

As murky as the value of the plaintiffs' claims is, the benefits of the Settlement are even murkier. That the benefits are non-monetary is not necessarily problematic— courts have recognized that reforms, such as material changes in corporate governance, provide substantial benefits to corporations and their shareholders. *See*, *e.g.*, *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993); *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1207 (6th Cir. 1992); *Zimmerman v. Bell*, 800 F.2d 386, 391 (4th Cir. 1986). Nevertheless, the non-monetary benefit must be "substantial," meaning that it "accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment


or protection of an essential right to the stockholder's interest." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 396 (1970) (quotation marks and citation omitted).

As an initial matter, the court is persuaded that the reforms in the Settlement, even if they remain in place only for four years, could provide a substantial benefit to JPMC shareholders. Professor Gordon opined that the Board's early participation in acquisition negotiations may result in a better price and the shaping of a better management team. He estimates that "even small improvements in deal terms" could "add tens of millions to shareholder value" in JPMC. Another expert retained by Blau, Professor James L. Bicksler, Professor of Financial Economics at Rutgers University Graduate School of Management, is more optimistic: He estimates that the reforms could result in a deal's increased value of anywhere between $600 million and $4.4 billion. Meanwhile, Professor Gordon opines that the Designated Committee's review of proxy statements will increase management accountability in negotiations, increase public confidence in the accuracy of proxy statements, and ultimately reduce the company's exposure to potential litigation. Professor Bicksler has argued, based on empirical studies, that similarly meaningful oversight of management by independent board members generally results in improved stock performance of up to 8.5%. (Based on JPMC's current market capitalization of approximately $130 billion, even a 1% positive incremental effect on JPMC's equity as a result of the reforms would be worth $1.3 billion per year.)

But the court also shares Sherlock's concern that the substantial value of the reforms could be entirely ephemeral. The Settlement provides JPMC's board with virtually unfettered discretion to modify the reforms at any time, as long as the change "would more appropriately effect the goals of the reforms." Although that power is constrained by the board's fiduciary

duties, at the fairness hearing the parties could not articulate how those duties would limit the board's discretion. Giving the board that flexibility is not necessarily problematic, but it should not be done in a way that limits the shareholders' ability to enforce their rights under the Settlement. As it stands, however, the board could make those changes without notifying shareholders before or after doing so—potentially rendering meaningless the clause giving shareholders the right to enforce the Settlement's terms. Because the Settlement does not, at the very least, obligate the board to give some notice to shareholders of any changes to the reforms (e.g., 30 days), its benefit may be insubstantial.

### C. Additional Factors

The court has considered the likely complexity, length and expense of continued litigation; the minimal opposition to settlement among affected parties; the opinions of competent counsel; the stage of the proceedings, and the amount of discovery completed. All of these factors weigh in favor of approving the Settlement. And, although this court may not "require the parties to accept a settlement to which they have not agreed," *Evans v. Jeff D.*, 475 U.S. 717, 726-27 (1986), the court is confident that, if the parties respond to the problems addressed in this opinion, a fair and reasonable settlement is attainable. But given the parties' deficient showing with respect to the first and most important factor, the court cannot approve the Settlement.

## IV. CONCLUSION

Because the plaintiffs have not attempted to quantify the value of their claims, and because the proposed Settlement does not provide a substantial benefit to the class, the court DENIES the motion for settlement.

Enter:

/s/David H. Coar

_____

**David H. Coar**
**United States District Judge**

**Dated: March 3, 2009**